UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVERGREEN MEDIA HOLDINGS, LLC, | : | No. 3:14-cv-01068 (MPS) |
| TONY DEROSA-GRUND, | : | |
| GERALD D. BRITTLE, | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | |
| LORRAINE WARREN, | : | |
| TONY SPERA, | : | |
| GRAYMALKIN MEDIA, LLC, | : | |
|     Defendants. | : | May 15, 2015 |

_____

**MEMORANDUM OF DECISION**

**I.     Introduction**

Plaintiff Gerald D. Brittle ("Brittle") is suing defendant Graymalkin Media, LLC ("Graymalkin") for copyright infringement and tortious interference with a contract or business expectancy, alleging that without his authorization, Graymalkin published a new version of a book to which he held a copyright, thereby infringing his copyright and interfering with the contract under which he held the copyright. Graymalkin has filed a motion to dismiss the claims against it on the ground that this Court lacks personal jurisdiction because Connecticut's long-arm statute does not grant jurisdiction and because Graymalkin lacks sufficient minimum contacts with Connecticut to permit jurisdiction under the Due Process Clause. As set forth herein, the Court rejects both of Graymalkin's arguments and therefore denies the motion to dismiss.

## II.   Background

Except where otherwise indicated, these facts are taken from the relevant portions of the complaint.

Co-defendant Lorraine Warren (who lives in Connecticut and has not joined in the motion to dismiss for lack of jurisdiction) and her late husband were paranormal investigators. In November 1978, the Warrens entered into an agreement with Brittle regarding publishing rights to a book authored by Brittle about the Warrens' investigations that was to be titled *The Demonologist* (the "Collaboration Agreement"). The Collaboration Agreement provided, among other things, that "[a]ll contracts for . . . rights in and to [*The Demonologist*] . . . shall require unanimous consent of [Mr. Brittle] and [Mrs. Warren and Mr. Warren]." The Collaboration Agreement was amended in 1990 and remains in effect. The first edition of *The Demonologist* was published in December 1980 by Prentice-Hall, Inc. Subsequent editions have been released, including a 2002 release by iUniverse.

In June 2013, Graymalkin's owner David Zindel ("Zindel") telephoned Brittle, who lives in Virginia, to inform him that Graymalkin would be the new publisher of *The Demonologist*. Zindel said that Graymalkin had arranged the deal with Warren, through her son-in-law Tony Spera ("Spera") (another co-defendant who lives in Connecticut and did not join in the motion to dismiss). Brittle protested because he had never consented to the change in publisher. Brittle reviewed the publishing contract proposed by Graymalkin and rejected it. In July 2013, Zindel sent Brittle a letter in which he claimed that Warren was entitled to sell rights to *The Demonologist* as long as profits were shared with Brittle. Over the next several months, Brittle and Zindel discussed a potential agreement as to *The Demonologist* but were unable to reach an agreement. In April 2014, Zindel emailed Brittle and claimed that under copyright law Warren

2

owned two-thirds of *The Demonologist* and that Warren told Zindel that no collaboration agreement was ever signed.

Graymalkin went forward with publishing a new version of *The Demonologist*. Brittle claims that "Graymalkin advertises on its official website that it 'distribute[s] to over 75,000 retailers, libraries, and distribution partners worldwide'" and that "Graymalkin claims that it 'distribute[s] to over 100,000 retailers, libraries, and distribution partners worldwide'" as recently as January 14, 2015. Brittle Aff. ¶¶ 12, 13. He also claims that "Graymalkin has shipped to and is currently offering for sale the unauthorized version of my 'The Demonologist' in Barnes & Noble retail outlets in: (i) Westport, Connecticut; (ii) Manchester, Connecticut; (iii) North Haven, Connecticut; and (iv) Milford, Connecticut." *Id.* ¶ 14. He also attaches printouts of Barnes & Noble's website showing the newest version of *The Demonologist* available for sale in those Connecticut locations. Exhs. C-E to Brittle Aff.

Zindel claims that he is the sole managing member of Graymalkin, which is a small company that publishes approximately forty titles. Zindel Aff. ¶ 3. He says that Graymalkin is registered and headquartered in California and has never had an office in Connecticut, conducted business in Connecticut, paid Connecticut taxes, or had any of its books manufactured, packaged, or warehoused in Connecticut. *Id.* ¶¶ 4-6. Graymalkin distributes its books in three ways: (1) to wholesale distributors, which then supply bookstores, other retailers, and libraries; (2) to secondary market distributors, which then supply libraries, schools, and similar institutions; and (3) to "etailers," which then ship books directly to consumers. *Id.* ¶ 7. Zindel says that none of Graymalkin's distributors are headquartered in Connecticut, warehouse Graymalkin books in Connecticut, or have asked Graymalkin to ship products to Connecticut. *Id.* ¶¶ 7-8.

Although Zindel admits that he communicated with Spera, a Connecticut resident, and entered into an agreement with Warren, also a Connecticut resident, to publish *The Demonologist*, he was never present in Connecticut during the communications. *Id.* ¶ 10. Graymalkin began publishing the book in July 2013. *Id.* ¶ 11. Zindel says that Graymalkin's website contains no physical address or phone number, does not display *The Demonologist*, and does not offer consumers the option to purchase books directly from the site. *Id.* ¶ 15. According to Zindel, Graymalkin does limited advertising, none of it directed at or conducted in Connecticut, and although Graymalkin has a modest social media presence, it has mentioned *The Demonologist* in only a few Facebook postings in March 2014.

### III.    Legal Standards

"[The] plaintiff bears the burden of showing the court has jurisdiction over the defendant," and the "burden is apportioned based on how far the case has progressed." *Corning Inc. v. Shin Etsu Quartz Products Co.*, 242 F.3d 364, at *2 (2d Cir. 2000). "If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "If the defendant asserts in a Rule 56 motion that undisputed facts show the absence of jurisdiction, the court proceeds, as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought." *Id.* "If the defendant contests the plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Id.* Where a plaintiff defeats a motion to dismiss through a prima facie showing of jurisdiction, the defendant may be permitted to renew the motion after discovery is completed, at which point

jurisdiction is determined on the basis of the evidence in the record. *See, e.g.*, *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 392 F. Supp. 2d 297, 304 (D. Conn. 2005); *Gomez v. ISB LTEE Ltd.*, 920 F. Supp. 275, 275 (D. Conn. 1995).

"The district court has considerable procedural leeway in deciding 12(b)(2) motions, and it may accept affidavits if it so chooses," and "[w]here . . . the district court relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction." *Corning*, 242 F.3d 364, at*2 (quotation marks omitted). "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

"To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, the Court must engage in a two-step analysis."[1] *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). "First, we apply the forum state's long-arm statute." *Id.* "If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Id.* at 164. The due process "analysis has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Id.* "With respect to minimum contacts . . . a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *Id.* "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit

---

[1] As noted, Brittle asserts a claim under federal copyright laws.

is unrelated to those contacts." *Id.* "With respect to our analysis of reasonableness as part of the due process inquiry, we ask whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' . . . ." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## IV. Discussion

### A. Connecticut's Long-Arm Statute

Brittle has made a sufficient prima facie showing that Connecticut's long-arm statute supplies jurisdiction over this case. That statute provides, in relevant part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, foreign partnership or foreign voluntary association, or over the executor or administrator of such nonresident individual, foreign partnership or foreign voluntary association, who in person or through an agent: . . . (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent . . . (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

Conn. Gen. Stat. § 52-59b(a) (emphasis added).[2] Because "in enacting § 52-59b, the legislature used New York Civil Practice Law § 302 (McKinney 1980-81 Supp.) as a model," Connecticut courts "find pertinent the judicial interpretation given to that New York statute." *Zartolas v. Nisenfeld*, 440 A.2d 179, 180-81 (Conn. 1981).

Accepting Brittle's allegations as true and resolving all doubts in his favor at this stage, the Court finds that he has made a sufficient prima facie showing that Graymalkin committed a tortious act within Connecticut from which this suit arises. Conn. Gen. Stat. § 52-59b(a)(2). Brittle alleges that Graymalkin, via the retailer Barnes & Noble, is selling in Connecticut a

---

[2] "[O]ur general long arm jurisdiction provision, § 52-59b, rather than our corporation specific long arm provision, § 33-929, applies to foreign LLCs." *Matthews v. SBA, Inc.*, 89 A.3d 938, 961 (Conn. App. 2014).

6

version of *The Demonologist* that infringes his copyright—a tort. *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 423 (S.D.N.Y. 2009) ("Claims for copyright infringement validly allege tortious activity . . . .").

Courts applying New York's equivalent long-arm provision in similar cases have held that "[c]opyright infringement is deemed to take place at the point of consumer purchase"[3] and therefore "[u]nder certain circumstances, a non-domiciliary who merely supplies infringing goods to the party that ultimately passes them off in New York may be subject to jurisdiction under 302(a)(2)." *Dan-Dee Int'l, Ltd. v. KMart Corp.*, No. 99CIV.11689(DC), 2000 WL 1346865, at *4 (S.D.N.Y. Sept. 19, 2000) (quotation marks omitted) (finding long-arm jurisdiction where a supplier "certainly knew or should have known that Kmart was a national chain with stores in New York" and "that Kmart contemplated sales nationwide—including in New York"); *see also, e.g.*, *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 302 (E.D.N.Y. 2009) ("Given these allegations that defendants . . . participated in the copyright infringement by supplying the plaintiff's work with knowledge that the subsequent infringing movie would be distributed in New York, the Court finds that the requirements of Section 302(a)(2) are met . . . ."); *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 64-65 (S.D.N.Y. 1993) ("Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state . . . even if the products for sale are offered through independent brokers in New York. *See* CPLR 302(a) ('in person or *through an agent*').") (emphasis in original); *Lipton v. The Nature Co.*, 781 F. Supp. 1032, 1035-36 (S.D.N.Y. 1992) ("Even if a non-domiciliary defendant commits infringement through sales by independent brokers or retail merchants in New York,

---

[3] *Accord Sutton v. Rehtmeyer Design Co.*, 114 F. Supp. 2d 46, 49 n.3 (D. Conn. 2000) ("Copyright infringement is deemed to take place at the point of consumer purchase . . . .")

this constitutes tortious conduct within New York and subjects the defendant to jurisdiction under CPLR Section 302. . . . The actual seller of the allegedly infringing product need not be a formal agent of the defendant; the term agent is given a broad interpretation.").

At this stage in the proceedings, when the Court lacks evidence detailing the nature of Graymalkin's arrangements with its distributors and the extent of its involvement in the Connecticut sales, Brittle is entitled to the benefit of the doubt in making his prima facie case that Graymalkin was sufficiently involved in the allegedly tortious sales to be reached by Connecticut's long-arm statute. *Whitaker*, 261 F.3d at 208 ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor."). Resolving doubts against Graymalkin is particularly warranted here, given that Graymalkin, by the selective manner in which it has responded to Brittle's allegations, has skirted key issues regarding its distribution arrangements and whether it has arranged to serve Connecticut's market through intermediaries. Graymalkin's denials pertain specifically to *directly* shipping to and selling in Connecticut, leaving the reader to infer by negative implication that Graymalkin may well have arranged to serve Connecticut's market by way of various intermediaries, including Barnes & Noble, which it does not deny. *See* Reply Br. at 5 ("Graymalkin . . . does not sell the books it publishes *directly* to consumers in Connecticut.") (emphasis added); *id.* at 6 ("[T]he fact that third parties—be they distributors or retailers—may sell *The Demonologist* to Connecticut residents does not establish that *Graymalkin* itself has minimum contacts with the State.") (emphasis in original). Similarly, despite relying on the implicit premise that its distributors independently determine where the books are distributed and sold, Graymalkin has not meaningfully addressed the issue. Instead, Graymalkin offers a limited description of those arrangements that sheds little light on whether the arrangements contemplate

Connecticut sales: Graymalkin attests that its distributors have never asked Graymalkin to ship books directly to Connecticut, that its distributors are not *headquartered* in Connecticut, and that its distributors do not *warehouse* Graymalkin books in Connecticut. Zindel Aff. ¶¶ 7-8. That type of artful response leaves the Court with "doubts [that must be] resolved in the plaintiff's favor" at this stage. *Whitaker*, 261 F.3d at 208.

Further, even if, for the sake of argument, the site of Graymalkin's allegedly tortious conduct were instead where it supplied the books to Barnes & Noble—and therefore potentially outside Connecticut[4]—those actions could still give rise to jurisdiction here if Graymalkin derives substantial revenue from interstate commerce and expected or reasonably should have expected that its actions would cause an injury to Brittle within Connecticut. Conn. Gen. Stat. § 52-59b(a)(3)(B). Graymalkin has not challenged Brittle's allegation that it has supplied the unauthorized version of *The Demonologist* to Barnes & Noble *somewhere*. And while Graymalkin challenges Brittle's characterization of it as a large-scale publisher, it does not dispute the allegation that it distributes its books through a nationwide (and international) network, from which—it is reasonable to infer in Brittle's favor at this stage—it derives substantial revenue.

As to the in-state injury, the situs of a commercial injury is generally where the plaintiff experiences a loss of business, not where the plaintiff resides, despite the fact that the plaintiff may, while in his home state, subsequently feel the economic impact of

---

[4] A small number of cases decided under the now-repealed Conn. Gen. Stat. § 33-411(c)(4) support the notion that such out-of-state sales would not provide a basis for a finding of conduct within Connecticut. *Marvel Products, Inc. v. Fantastics, Inc.*, 296 F. Supp. 783, 787 (D. Conn. 1968) ("The only sales the defendant made were to retailers, and, as discussed above, these sales were not made in Connecticut. . . . Any resales subsequently made in Connecticut by independent retailers cannot serve as a basis for jurisdiction over the defendant."); *DiMeo v. Minster Mach. Co.*, 225 F. Supp. 569, 571 (D. Conn. 1963). But the contemporary counterpart to that statute, Conn. Gen. Stat. § 33-929, applies only to corporate defendants, *see Matthews*, 89 A.3d at 961, and differs in important ways from the statute applicable to LLCs at issue in this case, Conn. Gen. Stat. § 52-59b, including the fact that the latter statute expressly covers torts committed "through an agent," a phrase that has been construed liberally in the context of identical language in the corresponding New York long-arm statute.

the lost business. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 164-65 (N.Y. 2011) ("In *Sybron*, we made clear that a tort committed outside the state that was likely to cause harm through the loss of business inside the state was sufficient to establish personal jurisdiction regardless of whether damages were likely recoverable or even ascertainable.") (citing *Sybron Corp. v. Wetzel*, 385 N.E.2d 1055, 1059 (N.Y. 1978)); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 793 (2d Cir. 1999) ("In *American Eutectic,* we examined a tort of unfair competition and held that the situs of injury was the place where the plaintiff *lost business* . . . .") (citing *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428 (2d Cir. 1971)); *Greene v. Sha-Na-Na*, 637 F. Supp. 591, 598 (D. Conn. 1986) ("[W]hile there is no question that the plaintiff suffered some harm in Connecticut, it is only in the sense that lost business anywhere in the United States indirectly would affect his income in Connecticut because he is domiciled here.").[5]

Brittle has made a sufficient prima facie showing of an in-state injury by alleging that because Graymalkin's unauthorized version is offered for sale in Connecticut, "it is likely the [sic] consumers are being diverted from purchasing legitimate copies of 'The Demonologist.'" Brittle Aff. ¶ 15. Further, because the Court resolves doubts about the nature of Graymalkin's arrangements with its distributors in Brittle's favor at this stage,

---

[5] The New York Court of Appeals recently held that a New York resident experienced an injury in New York when its copyright was infringed by uploading a book to the internet for anyone anywhere to read free of charge. *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159 (N.Y. 2011). The court reasoned that "the alleged infringement involves the Internet, which by its nature is intangible and ubiquitous," and thus "the role of the Internet in cases alleging the uploading of copyrighted books distinguishes them from traditional commercial tort cases where courts have generally linked the injury to the place where sales or customers are lost." *Id.* at 163, 165. The court expressly declined to comment on whether, in a case not involving the internet, a copyright holder might experience the infringement injury in its state of residence, and noted that there was disagreement on this issue in the courts. *Id.* at 165 n.5. The Second Circuit recently declined to extend *Penguin* to a non-internet case. *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 220 (2d Cir. 2013) ("This case is therefore more like traditional commercial tort cases in which the place where [the plaintiff's] business is lost or threatened exerts a significant gravitational influence on the jurisdictional analysis.") (quotation marks omitted). As Brittle relies upon the availability of *The Demonologist* in physical bookstores in Connecticut as the source of the injury, this Court need not address the present uncertainty as to whether and under what circumstances copyright infringement via the internet may provide an additional, or substitute, situs of injury.

10

there has been a prima facie showing that Graymalkin expected or should have expected that Brittle would be injured, i.e., that he would lose sales, in Connecticut. *See, e.g.*, *Halas v. Dick's Sporting Goods*, 105 A.D.3d 1411, 1412-13 (N.Y. App. Div. 2013) ("[D]efendant should have reasonably expected that its negligence would have consequences in individual states, including New York, because its distributor targets the nationwide market . . . . While the [product] was not specifically earmarked for use in New York, defendant sold it to a company that distributes products to states across the country, including New York.").

### B. Due Process Clause

Brittle's allegations also constitute a sufficient prima facie showing that the requirements of the Due Process Clause have been satisfied.

"So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). "But a defendant's relationship with a [resident] plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014); *see also Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). "Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him," *Walden*, 134 S. Ct. at 1122, although "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," *id.* at 1123.

Sufficient minimum contacts exist under the Due Process Clause where, as here, an out-of-state defendant is sued in connection with the in-state sale of products by a third-party distributor, where there is evidence that the defendant attempted to serve the state's market through the distributor, even in the absence of an express agreement to deliver the products into that specific state. In *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236 (2d Cir. 1999), a manufacturer was sued for products liability after selling an allegedly defective machine to a third-party distributor based in Pennsylvania, who then sold the machine in New York. The manufacturer moved to dismiss for lack of personal jurisdiction, claiming that it was "a corporation existing under the laws of Japan with its principal place of business in Japan," was "not licensed or registered to do business in New York," had "[n]ever directly transacted or solicited business in New York," had "never provided any services nor entered into any contract in New York," and "had no specific knowledge of what would become of the . . . machine after it was sold to [the distributor] in Pennsylvania, beyond the general knowledge that [the distributor] would resell it somewhere in Pennsylvania or one of the other 49 states in the United States." *Id.* at 239 (quotation marks omitted). The Second Circuit found that New York nonetheless had specific jurisdiction over the manufacturer because it had entered into an exclusive sales agreement with the distributor, "which contemplate[d] that [the distributor] w[ould] sell [the manufacturer's] machines in North America and throughout the world" and "serve[d] as evidence of [the manufacturer's] attempt to serve the New York market, albeit indirectly," *id.*, and therefore was "the type of purposeful action sufficient to support a finding of minimum contacts," *id.* at 244.

According to Brittle's allegations, read in the light most favorable to him and with doubts about the nature of Graymalkin's distribution arrangements resolved in his favor, Graymalkin supplied infringing copies of *The Demonologist* to Barnes & Noble in contemplation of the fact

12

that they would be distributed to consumers nationwide, including in Connecticut. This constitutes a prima facie showing of sufficient minimum contacts for Connecticut to assert specific jurisdiction over Graymalkin in a suit arising from the alleged infringement that occurred when the books were offered for sale in Connecticut. *See Kernan*, 175 F.3d 236; *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 303 (E.D.N.Y. 2009) ("Because plaintiff has alleged that [defendants] supplied the plaintiff's work to distributors with the knowledge that the resulting infringing work would be disseminated in New York, the Court finds that, if these allegations are proven, it would be reasonably foreseeable to them that they would be subject to suit in New York State and they would have been purposefully availing themselves of the privilege of conducting activities in this State.").

Finally, Graymalkin has offered no persuasive argument as to why the exercise of jurisdiction would be unreasonable despite the presence of sufficient minimum contacts. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) ("While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Graymalkin's assertion that defending the suit in Connecticut would be burdensome must be weighed against Brittle's interests and the judicial system's interest in efficient adjudication of controversies. *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 113 (1987). Efficient adjudication is a particularly relevant consideration in this case, which presents the joinder of several related parties and claims. Declining to exercise jurisdiction over Graymalkin could

impose significant costs on the judicial system, in the form of duplicative or overlapping litigation and the risk of inconsistent results.

## V. Conclusion

For the reasons above, defendant Graymalkin Media, LLC's Motion to Dismiss (ECF No. 23) is DENIED without prejudice to renewal if discovery demonstrates that personal jurisdiction is lacking.

**SO ORDERED** this 15th day of May 2015 at Hartford, Connecticut.

/s/
Michael P. Shea
United States District Judge