**JAMS ARBITRATION**
**Reference No. 1210031019**

**New Line Productions, Inc. and Warner**
**Bros. Entertainment, Inc.,**
          **Claimants and Counter-Respondents,**

                    v.

**Tony DeRosa-Grund; Evergreen Media**
**Holdings, LLC; Silverbird Media Group, LLC;**
**and Evergreen Media Group, LLC,**
          **Respondents and Counter-Claimants.**

———————————————————————

**FINAL AWARD**

**Counsel**:

Michael O'Connor, Esq.
Sarah Cronin, Esq.
Kelley, Drye & Warren, LLP
10100 Santa Monica Blvd., 23rd Fl.
Los Angeles, CA    90067-4008
Tel:    (310) 712-6100
Fax:    (310) 712-6199
moconnor@kelleydrye.com
scronin@kelleydrye.com

Counsel for Claimants and Counter-Respondents

Charles W. Grimes, Esq.
Michael R. Patrick, Esq.
Grimes LLC
488 Main Ave.
Norwalk, CT    06851-1008
Tel:    (203) 849-8300
Fax:    (203) 849-9300
grimes@gandb.com
Patrick@gandb.com

Counsel for Respondents and Counter-Claimants

1

**Arbitrator**:

Judge Terry Friedman (Ret.)
JAMS
1601 Cloverfield Blvd
Suite 370 – South
Santa Monica, CA      90404
Tel: (310) 309-6206
Fax: (310) 396-7576
tfriedman@jamsadr.com

**Place of Arbitration**:   **Santa Monica, California**

**Date of Final Award**:   **February 4, 2015**


The undersigned Arbitrator, having been designated by the parties in a Stipulation Re: Disclosure of Arbitrator, executed by Claimants/Counter-Respondents on October 14, 2014 and by Respondents/Counter-Claimants on October 15, 2014, and pursuant to arbitration clauses set forth in Paragraph 21 of an Option Quitclaim Agreement ("PCOs") made November 11, 2009 and executed by the parties and Paragraph 25 of a Producer Loanout Agreement, dated November 11, 2009 and executed by the parties, and having read and considered the submissions, documentary and testimonial proof, arguments and allegations of the parties, finds and concludes and issues this Final Award, as follows:

## I.          INTRODUCTION AND PROCEDURAL STATEMENT

Claimant and Cross-Respondent New Line Productions, Inc. is a motion picture production company.      Its parent, Claimant and Cross-Respondent Warner Bros. Entertainment, Inc., is a multimedia entertainment company.[1]  Tony DeRosa-Grund is an individual who produces films and television programs.      Evergreen Media Holdings, LLC; Silverbird Media Group, LLC; and Evergreen Media Group, LLC are companies owned and/or controlled by DeRosa-Grund.[2]

The parties initially selected Hon. Richard C. Neal (Ret.) to arbitrate this dispute.      Justice Neal issued Preliminary Conference Orders ("PCOs") No. 1 (August 26, 2013) and No. 2 (September 4, 2013), establishing procedures for the Arbitration.      Justice Neal also issued an Order denying Respondents' Motion for Interim Relief and Confirming Plenary Hearing Dates (October 4, 2013); an Order After Discovery Conference (January 17, 2014); an Order After Final Pretrial Phone Conference (January 23, 2014); an Order re Further Proceedings (April 21, 2014); an Order re Rescheduling Plenary Hearing (April 24, 2014); an Order re Lionsgate Documents and New Counsel for

---

[1]  Collectively, New Line and Warner Bros. will be identified as "Claimants" or "New Line."
[2]  Collectively, DeRosa-Grund, Evergreen Media Holdings, Silverbird Media and Evergreen Media Group will be identified as "Respondents" or "DeRosa-Grund."

Respondents (June 6, 2014); an Order After Telephonic Status Conference (July 3, 2014), an Order re Motions denying Respondents' Motion for Leave to File Summary Disposition Motion, denying Respondents' Motion for Additional Discovery and granting Claimants' Motion for Leave to Amend Answer to Counterclaim (August 20, 2014); an Order denying Respondents' Letter Motion for Reconsideration and Other Relief (September 9, 2014); an Order Re Respondents' Letter Requests (September 21, 2014); a Final Further Order re Discovery denying Respondents' document requests (October 2, 2014); and an Order After Final Pretrial Phone Conference (October 2, 2014).

On October 13, 2014, JAMS served notice that Justice Neal regrettably withdrew as Arbitrator to undergo medical treatment[3] and that the undersigned Arbitrator had been appointed. The undersigned Arbitrator issued PCOs No. 3 (October 17, 2014), No. 4 (October 20, 2014), No. 5 (October 21, 2014), No. 6 (October 23, 2014), No. 7 (October 24, 2014) and No. 8 (November 10, 2014), which all regarded conduct of the Arbitration Hearing, and issued an Order denying Respondents' Motion to Continue (October 28, 2014).

The parties exchanged information.

The Arbitration Hearing was conducted on November 4 – 7, 2014.     Certified Shorthand Reporters Janet F. Murphy (CSR 9650) and Jan M. Roper (CSR 5705) transcribed the Hearing.

Each side offered documentary evidence at the Hearing, and such evidence was admitted as follows: New Line Exhibits ("NL") 1–375 and DeRosa-Grund Exhibits ("DRG") 1 – 127.     New Line's objections to DRG 13, 16 & 128 were overruled.     New Line's objection to DRG 17 was sustained on the ground it was not produced in discovery.     Each side called and cross-examined these witnesses: Craig Alexander, Kavita Amar, Gary Barkin, Faust Checho, Tony DeRosa-Grund, John Gatti, Walter Hamada, Richard Levin, Patrick Perkins, Allison Strina, Robert Wyman and Courtney Young. DeRosa-Grund offered Declarations of Craig Alexander, Gerald Brittle, DeRosa-Grund, Emily Morgatta, REDACTED     Paul Rockeferry, Peter Safran, Harrison Smith, Tony Spera and Lorraine Warren.     New Line objected to the admission into evidence of these Declarations.     The Arbitrator overruled the objections to the DeRosa-Grund, Gatti and Lionsgate executive's Declarations and sustained the objections to the others.

At the conclusion of the presentation of testimony on November 7, 2014, the parties orally declared that they had no further evidence to offer and the undersigned Arbitrator declared the evidentiary portion of the Hearing closed.     The parties orally stipulated to file simultaneous Closing Briefs of unlimited length on December 8, 2014 and to present oral closing arguments in person on December 18, 2014.     The Arbitration Hearing was deemed closed on December 18, 2014.     A Partial Final Award was issued January 20, 2015, which found New Line to be the prevailing party and allowed the parties to file statements regarding New Line's entitled prejudgment interest.     New Line filed a timely statement of prejudgment interest.     DeRosa-Grund did not file a timely responsive statement, which was due February 3, 2015.     New Line filed a Request for Correction of computational, typographical or other similar errors on January 27, 2015.

II.     **FACTS**

---

[3]  Justice Neal passed away on January 1, 2015.

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award.    Facts not pertinent or necessary to the Award are omitted.    In preparing this statement of facts, the Arbitrator considered all testimony and admitted documentary evidence.    To the extent that this recitation differs from any party's position, that is the result of the Arbitrator's determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

## A.    **The Parties**

DeRosa-Grund is an independent film and television producer.    He resides in Texas. DeRosa-Grund did not appear in person at the Hearing, citing health reasons.    A prior Hearing date in March 2014 was continued due to DeRosa-Grund being hospitalized due to serious medical issues. DeRosa-Grund was the producer of the theatrically released motion picture entitled *Josie and the Pussycats*.

New Line is a wholly owned subsidiary of Warner Bros.    Both New Line and Warner Bros. are headquartered in Los Angeles, California.

## B.    **Pre-Agreement Negotiations**

Lorraine and Ed Warren are longtime paranormal investigators.    The Warrens maintained notes of their investigations in Case Files.    DeRosa-Grund established a professional and personal relationship with the Warrens in the 1990s.    DeRosa-Grund endeavored to work with the Warrens to exploit their Case Files for theatrical purposes.    He drafted a film treatment and called it The Conjuring.    Along with co-producer Peter Safran, DeRosa-Grund pitched the treatment to various film studios.    DeRosa-Grund testified that six studios engaged in a bidding war for the property.

DeRosa-Grund contacted New Line Senior Vice-President for Business Affairs Craig Alexander in June 2009 and represented to Alexander that he had a life story agreement with the Warrens.    Alexander testified that DeRosa-Grund was not a well-known producer and that this was their first contact.    Safran pitched the project to Alexander.    New Line's creative executives were interested in acquiring the property in part because of the potential it offered for multiple motion pictures.    Later in Summer 2009, Alexander learned that DeRosa-Grund had entered a deal regarding "The Conjuring" with Summit Entertainment but that the deal had fallen through.    Summit executives informed Alexander that there were chain of title issues concerning DeRosa-Grund's Silver Bird and Evergreen entities, an involuntary bankruptcy involving DeRosa-Grund that could interfere with rights in "The Conjuring," and that Summit did not want to work with DeRosa-Grund because he was difficult.    "The Conjuring's" writers, Chad and Carey Hayes, wanted to continue working on the project and brought it back to New Line.

DeRosa-Grund testified that in a telephone conversation on December 1, 2009 in connection with their negotiating a Deal Memo to submit to the Bankruptcy Court, Alexander told him that he would be "locked for life" as a producer on any sequels to "The Conjuring."    Alexander denied making such a statement.    The Deal Memo did not contain any "locked for life" provision.

NL 35.    No evidence was presented to corroborate DeRosa-Grund's testimony that he would be "locked for life" or be attached on sequels.    In connection with efforts to resolve DeRosa-Grund's bankruptcy proceeding, Gatti's law partner David McGriff sent a Short Form Agreement to Alexander setting forth the deal points between DeRosa-Grund and New Line.    The Short Form Agreement made no mention of DeRosa-Grund producing sequels to "The Conjuring" or being "locked or life" or "attached." NL 33. Alexander testified that New Line could not run its business if terms such as "locked for life" or "attached" were agreed to between it and a producer but not expressly contained in a written agreement.

## C.        **The Agreements**

DeRosa-Grund and New Line entered several agreements.    The most important agreements were the Option Quitclaim Agreement ("Quitclaim"), the Producer Loanout Agreement "PLA") and Amendment #1 to the Quitclaim ("Amendment") (collectively, "Agreements").    The Quitclaim and the PLA were each made on November 11, 2009.

### 1.        **The Quitclaim Agreement**

The pertinent provisions of the Quitclaim are these:

1A.    <u>PROPERTY</u>:
  (a)    Any and all literary material . . . in connection with the project currently known as "THE CONJURING" fka 'THE UNTITLED HAYES BROTHERS PROJECT" . . . fka "THE DEMONOLOGIST", including without limitation:
         (ii) Any and all drafts, revisions and rewrites of that certain screenplay entitled "The Conjuring" and any related material written by Chad Hayes and Carey Hayes.
         (iii) The entire case file library (approximately 8,000 case files) related to the Warrens' paranormal investigations ("Case Files"), including but not limited to, all interviews, case histories, photographs, notes, timelines (including the entire Case File for the Perrons and the timeline of events prepared by Andrea Perron) and the "Preferred Case Files."
  (b)    Any and all right, title and interest in and to the entire life stories of Ed and Lorraine Warren . . . . including without limitation, all paranormal investigations of the Warrens . . .
  (c)    Any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rendered, and/or material furnished in connection with any and all motion pictures or other productions to be based in whole or in part on the Literary Material (the first production shall be referred to as the "Picture") or which transfer rights in and to the Literary Material, including without limitation, the following:
         (i)    <u>Warren Documents</u>
  (d)    Any and all rights and interests of any type and nature heretofore or hereafter acquired by the Company (DeRosa-Grund and his entities) with respect to the Property and/or pursuant to the Agreements, including without limitation, all motion picture and other rights to the life stories of the Warrens . . . and the characters of Ed and Lorraine Warren.
  (e)    The term "Property" shall mean (a) the Literary Material, (b) the Life Rights, (c) Other Rights and (d) the Agreements.
2.    <u>OPTION</u>:
  (a)    In consideration of the payment of $75,000 . . . New Line is hereby granted an exclusive irrevocable option to acquire all of Company's right, title and interest (except for the "Reserved

Rights" as defined below) in and to the Property . . .

   (c)  <u>Option Period Activities:</u>

      (ii)  <u>Warren Case Files</u>:  Within 7 days of Company's (sic)[4] payment of the Initial Option Payment, Company shall submit to New Line a summary of no less than 25 Case Files (including the Case Files involving the Perrons) that Company believes in good faith are best suited for motion picture development and production.  Within 30 days of New Line's receipt of such Case Files, New Line will select up to 25 Case Files for motion picture development in accordance with this Quitclaim Agreement ("Preferred Case Files") . . . If, at any time after selecting a Preferred Case File, New Line elects to exchange a Preferred Case File for a non-selected Case File from any of Company's submissions, New Line may make such an exchange in its discretion.

3.   <u>QUITCLAIM</u>:  Provided New Line duly exercises the Option during the Option Period and effects payment to Company of the Purchase Price, Company does hereby quitclaim to New Line all of Company's right, title and interest, excluding only the "Reserved Rights" (defined below) in and to the Property."

4.   <u>PURCHASE PRICE</u>:  The "Purchase Price" means . . . $750,000 (less the Initial Option Payment and any "Third Party Rights Payments") . . . As used herein, "Third Party Rights Payments" shall mean any monies payable by New Line to third parties (e.g., the Warrens . . . the Perrons . . . the bankruptcy court/trustee, etc.) in connection with any life story or other chain of title rights for the Property or the Picture . . .

5.   <u>ADDITIONAL PAYENTS/DEFERMENTS</u>:  If New Line exercises the Option and the Picture is produced and released by New Line pursuant to this Quitclaim Agreement and if Company is not in breach of any representation, warranty or agreement contained herein, Company shall be entitled to the following additional payments subject to the conditions specified and in accordance with the terms of the applicable exhibit attached hereto . . .

   (a)  <u>Deferments</u>

   (b)  <u>Theatrical Sequels and Remakes</u>:  If an English language feature-length live-action theatrical sequel or remake motion picture based on the Property is produced pursuant to the Rights, or if an English language feature-length live-action theatrical motion picture Case File Production is produced pursuant to the Rights, a sum equal to 100% of the Purchase Price . . . payable 50% within 10 days of the commencement of principal photography of each . . . and 50% within 10 days following the completion of principal photography of each . . . provided that, with respect to such sequels only, in the event that the DBO (domestic box office) for the immediately preceding sequel reaches or exceeds $125,000,000, New Line will give good faith consideration to raising the sequel payment under this Paragraph by up to 15% of the sequel payment of the immediately preceding sequel. . . For the avoidance of doubt, New Line's failure to increase the sequel payment in accordance with this Paragraph will not be a breach of this Quitclaim Agreement.

7.   <u>GRANT OF RIGHTS</u>:  Conditioned only upon New Line's exercise of the Option and payment of the Purchase Price, Company hereby sells, grants, conveys and assigns to New Line exclusively, in perpetuity and throughout the universe, the entire copyright (including, to the fullest extent permitted by law, all renewal, extension and reversion rights in every county of the world) and all right, title and interest in the Property (all of the foregoing being collectively referred to as the "Rights") in and to the Property, except for the "Reserved Rights" specified below. . . Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

---

[4] Reference to "Company" appears to be a typographical error.  New Line is the payor of the Initial Option Payment, not Company.

(a)   <u>Audiovisual Works</u>   The right to produce audiovisual works of all types now know or hereafter devised, and sequels to and remakes thereof and all other types of derivative works based thereon intended for exploitation in any medium and delivery by any means or medium, now know or hereafter devised . . . and all music . . .

(b)   <u>Copyright/Exploitation Rights</u>:   With respect to works produced pursuant to the Rights, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Property nor or hereafter recognized in any and all territories and jurisdictions . . .

(i)   <u>Life Rights</u>:   Upon exercise of the Option, New Line shall own the exclusive rights throughout the world, in perpetuity, to produce, distribute, exhibit, license and otherwise exploit, in any and all media . . . the Works, without limitation sequels and remakes, based on or portraying the life stories of the Warrens, the life stories of the Perrons . . . The rights granted by Company to New Line hereunder are in addition to, and this Quitclaim Agreement shall in no way limit, the rights with respect to the subject matter of this Quitclaim Agreement . . .

8.   <u>RESERVED RIGHTS</u>:   Company reserves the following rights in the Case Files, subject to the following terms and conditions: (i) Company shall have no right to utilize any elements from the Picture or any work produced pursuant to the Rights . . . (ii) the Warrens . . . may not appear as characters in any material developed based on the Reserved Rights, except as set forth in Paragraph 8(a) below, and (iii) New Line has the right to select any of the Case Files for development and use in connection with the Picture and other productions hereunder, whether or not such Case File is also being used in connection with the Reserved Rights.

(a)   <u>Television Rights</u>:   Subject to the foregoing and Paragraph 8(c) below, the right to produce episodic television series ("Company Television Series") based on the Case Files which are not selected by New Line as Preferred Case Files and the following ancillary rights to the Company Television Series . . . :   merchandising, soundtrack recording, video game, commercial tie-ups, home entertainment and music publishing . . . For the avoidance of doubt, Company may not include any aspect of the Preferred Case Files, the Picture or any New Line production in such Company Television Series or ancillary rights exploitation, and New Line has the exclusive right to develop and produce motion pictures and other related productions based on the Preferred Case Files . . .

(b)   <u>Comic Books/Graphic Novels</u>:   Subject to the foregoing, the right to publish comic books and graphic novels based on any Case Files which have been reviewed and specifically rejected by New Line in accordance with the procedure set forth in Paragraph 2(c)(ii) . . .

(c)   <u>First Negotiation/Last Refusal</u>:   If Company at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the Reserved Rights (other than publishing rights to comic books and graphic novels), Company shall give New Line written notice thereof and New Line (and its affiliates) shall have an opportunity to so negotiate prior to Company so negotiating with any third party.   If New Line (or its affiliates) elects to so negotiate, Company and New Line (or its affiliates) shall negotiate in good faith for a period of not less than 30 days from the commencement of such negotiations, and if an agreement does not result therefrom Company may thereafter negotiate with any third party.   If Company at any time is prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the Reserved Rights (other than publishing rights) Company shall before entering into such agreement give New Line written notice of the proposed terms thereof . . . and the party involved.   In each instance, New Line (or its affiliates) shall then have 10 business days after receipt of Company's written notice in which to elect to acquire the rights involved on the monetary terms contained in the notice, it being understood that New Line (or its affiliates) shall not be obligated to meet non-monetary terms . . . set forth in such notice.

10.   REPRESENTATIONS AND WARRANTIES:   Company makes the following representations and warranties with respect to the Property:

(a)   Company is the sole and exclusive owner of all of the rights granted and to be granted to New Line hereunder, and Company has the right to enter into and perform this Quitclaim Agreement.

(f)   As of the date of execution . . . of this Quitclaim Agreement by Company, the Agreements are in full force and effect . . .

11.   INDEMNITY BY COMPANY:   Company shall indemnify . . . New Line . . . free and harmless against any and all claims . . . or expenses and costs (including reasonable attorneys' fees) arising out of or resulting from . . . any breach by Company of any term or condition of this Quitclaim Agreement . . . and all exhibits hereto.   Should a claim or demand be made, Company shall give prompt notice thereof to New Line and New Line shall have the sole and exclusive right to defend, settle or compromise any claim or demand through counsel of its choice on such terms and in such manner as New Line shall in its sole discretion determine.   Company may join in any such action or proceeding . . . however New Line shall retain control of any such action.

13.   TERMINATION:   New Line and Company hereby agree that if New Line fails to pay the Company the Purchase Price as required herein, this Quitclaim Agreement shall be of no force and effect whatsoever and all right, title and interest quitclaimed hereunder shall automatically and immediately revert to Company without prejudice to Company's or New Line's claims (if any) for breach of the contract.

14.   TITLE:   Upon New Line's written request, Company . . . agrees to withdraw . . . its registration of the title "The Conjuring," if any, with the MPAA Registration Bureau and to allow New Line's registration of such title without prejudice.

17.   ENTIRE AGREEMENT:   This Quitclaim Agreement contains the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations, and contains all of the terms, conditions, understandings and promises of the parties hereto, relating in any way to the subject hereof.   This Quitclaim Agreement may not be modified except by a document signed by both parties.

18.   BINDING:   . . . All prior negotiations, agreements and writings pertaining to the subject matter hereof are merged herein.

19.   REMEDIES:

(a)   Injunctive Relief Against New Line:   Company acknowledges that in the event of a breach of any of New Line's obligations under this Quitclaim Agreement, the damage (if any) caused to Company thereby will not be irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief . . . Company shall neither seek or be entitled to any equitable relief to restrict or interfere with New Line's right to develop, produce, distribute, market or exploit the Picture or any other productions produced pursuant to this Quitclaim Agreement . . .

(b)   New Line's Remedies:   Company acknowledges and agrees that the rights and privileges granted and agreed to be granted to New Line pursuant to this Quitclaim Agreement are of a special, unique, unusual extraordinary and intellectual character, making them difficult to replace and giving them a peculiar value, the loss of which cannot be reasonably compensated in damages in an action at law; that if Company shall breach any provision of this Quitclaim Agreement, new Line will be caused irreparable damage; and that, therefore, New Line shall be entitled as a matter of right, at its election, to enforce this Quitclaim Agreement and all of the provisions hereof by injunction or other equitable relief.

20.   CROSS-DEFAULT:   Any default by Company under any of the Agreements shall also be deemed a breach by Company of this Quitclaim Agreement.   Any default by Company under this Quitclaim

8

Agreement shall also be deemed a breach by DeRosa-Grund of the Producer Agreement.

21.   GOVERNING LAW/DISPUTE RESOLUTION:   All controversies, claims or disputes between the parties to this Quitclaim Agreement arising out of or related to his Quitclaim Agreement or the interpretation, performance or breach thereof . . . and the determination of the scope or applicability of this agreement to arbitrate . . . shall be resolved according to the procedures set forth in Paragraph 21(a) below which shall constitute the sole dispute resolution mechanism hereunder.

(a)   Arbitration:   All Disputes shall be submitted to final and binding arbitration . . . The arbitration shall be initiated and conducted according to . . . the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures . . . including the Optional Appeal Procedure. . . The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute . . . The arbitrator will provide a detailed written statement of decision . . . The parties shall be responsible for payment of their own attorneys' fees in connection with any proceedings under Paragraph 21(a).

(e)   Governing Law/Jurisdiction and Venue:   This Quitclaim Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein.

NL 26.

## 2.        The Producer Loanout Agreement

Certain provisions in the PLA replicate provisions in the Quitclaim.   The pertinent, non-duplicative provisions of the PLA are these:

This agreement . . is entered into . . . in connection with the motion picture project presently entitled "THE CONJURING" ("Picture").

2.   DEVELOPMENT:

(b)   Completion of Development:   In the event Company "Elects to Proceed to Production" of the Picture based on the screenplay supervised by Artist . . . subject to Paragraphs 14 and 16 below, Company shall be deemed to have engaged Artist's productions services on a "pay or play" basis for the "Basic Compensation", as defined in Paragraph 4 below . . . Company may "Elect to Proceed to Production" by written notice or shall be deemed to have "Elected to Proceed to Production" when Company has: . . . (iii) notified Artist in writing of the start date for the commencement of principal photography.

4.   COMPENSATION:

(b)   Basic Compensation:   If Company engages Artist's production services on a "pay or play" basis . . . Lender shall be entitled to basic compensation in the amount of $500,000, less the Development Fee and any deductions . . .

7.   CREDIT: Company shall accord Artist the following credit in connection with the Picture:

(a)   Personal Credit.   As individual producer substantially in the form "Produced By Tony DeRosa-Grund.   (i)   On the screen in all positive prints of the Picture, on a separate card . . .

(b)   Production Credit.   A production credit substantially in the form "An Evergreen Media Group Production . . . (i) On the screen in all positive prints of the Picture, on a separate card . . .

9.   RIGHTS:

(a)   Ownership:   All results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender (Evergreen Media Holdings, LLC) and/or Artist (Derosa-Grund) in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time

heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively "Material"), are and shall be deemed to be "works for hire" for Company (New Line).    Accordingly, Company is and shall be considered the author and . . . the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights").    The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including . . . the right to exploit the Material throughout the universe in perpetuity in all media, markets and language and in any manner now known or hereafter devised . . .

16.    <u>NO OBLIGATION TO PROCEED/"PAY OR PLAY"</u>:    Notwithstanding any other provision of this Agreement, Company shall have no obligation to utilize Artist's services . . .

22.    <u>CONFIDENTIALITY/PUBLICITY</u>:    Neither Lender nor Artist shall without Company's prior written approval, (i) issue or authorize the publication of any news story, publicity or publicity materials relating to the Picture, Artist's services hereunder, or Company, (ii) make any derogatory or knowingly false statements concerning the Picture, Company or any officers or employees of the Company, (iii) disclose any confidential information regarding Company or the Picture . . . or (iv) encourage any other individual to do any of the foregoing . . .

24.    <u>PREMIERE</u>:    If Lender and Artist perform all services required hereunder and are not in default hereof and Artist is accorded "produced by" credit on the Picture, Company shall invite Artist and a non-business companion to one U.S. celebrity premiere of the Picture . . . If Artist attends such a celebrity premiere . . . Artist and Artist's non-business companion shall be provided with round-trip transportation, first class . . . and first-class hotel accommodations.

26.    <u>MISCELLANEOUS</u>:

   (a)    <u>Entire Understanding . . .</u>:    This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements or understandings, written or oral, relating to the subject matter hereof.    Each of Lender and Artist hereby acknowledges that no representation or promise not expressly contained in this Agreement has been made by Company or any of its officers, employees, agents or representatives . . . This Agreement may not be modified except by a written instrument signed by all parties hereto . . .

NL 27.

Exhibit A:

12.    <u>Ownership</u>:    Participant expressly acknowledges that Participant has and will have    . . . no lien . . . to the Defined Gross of the Picture.

**3.**        **Amendment to Quitclaim Agreement**

   The pertinent provisions of the Amendment, which is dated October 19, 2010, are these:

   WHEREAS, New Line is currently negotiating an option and purchase agreement whereby New Line will acquire an exclusive option to purchase the Warren Rights directly from Lorraine Warren . . .

   WHEREAS, upon New Line securing the Warren Rights, New Line has agreed to grant Company (DeRosa-Grund and his entities) certain, limited television series rights, subject to the terms and conditions set forth herein and in the Quitclaim Agreement.

   For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto hereby agree to amend the Quitclaim Agreement . . .

2.    <u>Case File Selection</u>.    . . . the procedure for submission, review and selection of the Case Files

10

set forth in Paragraph 2(c)(ii) of the Quitclaim Agreement will no longer be applicable, and in lieu thereof, the procedure set forth below will govern . . .

    (ii)  <u>Warren Case Files</u>:  Within 7 days of Company's[5] payment of the Initial Option Payment, Company will submit to New Line a summary of no less than 25 Case Files (including the Case File involving the Perrons, and New Line hereby acknowledges receipt of 25 summaries) that Company believes in good faith are best suited for motion picture development and production. The parties acknowledge that, pursuant to the New Line/Warren Life Story Agreement currently being negotiated, Lorraine Warren has agreed to provide New Line with summaries of up to an additional 50 Case Files.  Accordingly, upon receipt of the additional Case File summaries from Lorraine Warren, New Line will select up to 25 Case Files (from Company's and Lorraine Warren's submissions) for motion picture development in accordance with this Quitclaim Agreement . . . The Case Files which are reviewed and rejected by New Line may be utilized by the Company in connection with a "Company Television Series" . . . If, at any time after selecting a Preferred Case File, New Line elects to exchange a Preferred Case File for a rejected Case File from any of Company's or Lorraine Warren's submissions, New Line may make such exchange in its discretion . . . New Line's Rights with respect to the Case Files shall be exclusive . . . Company hereby represents and warrants that as of the date of execution of the first amendment to this Quitclaim Agreement, none of the Case Files have been offered for, or are being considered for development as a "Company Television Series."

6.    <u>Assignment of Television and Other Rights</u>.  Throughout the Quitclaim Agreement, the defined term "Reserved Rights" is hereby replaced with "Quitclaimed Rights."  Paragraph 8 of the Quitclaim Agreement is hereby deleted and replaced with the following:

    8.    <u>QUITCLAIMED RIGHTS</u>:  . . . New Line hereby quitclaims the following rights in the Case Files to Company . . . subject to the following terms and conditions: (i) Company shall have no right to utilize any elements from the Picture or any work produced pursuant to the Rights . . . (iii) New Line has the right to select any of the Case Files for development and use in connection with the Picture and other productions hereunder, whether or not such Case File is also being used in connection with the Quitclaimed Rights . . .

        (a)  <u>Television Rights</u>.  [same as Quitclaim]
        (b)  <u>Comic Books/Graphic Novels</u>.  [same as Quitclaim]
        (c)  <u>First Negotiation/Last Refusal</u>.  [same as Quitclaim except term "Reserved Rights" replaced by "Quitclaimed Rights" . . .

8.    <u>Release/Development Fee and Partial Producer Advance</u>.  As consideration for the release of claims set forth below, New Line hereby agrees to advance the total sum of $25,000 to EMH . . . which shall be an advance of the following sums: (i) the second half of the Development Fee payable under Paragraph 4(a) of the Producer Agreement . . . and (ii) $12,500 of the Basic Compensation payable under Paragraph 4(b) of the Producer Agreement . . . the following is hereby added as Paragraph 24 of the Quitclaim Agreement.

    24.  <u>Release of Claims</u>.  Company acknowledges that, if DeRosa-Grund contributed any oral or written material to the screenplay for the motion picture currently entitled "The Conjuring" (including, but not limited to, a treatment), such material is owned and controlled by Company . . . Further, Company makes the following release of claims.  Company . . . covenant(s) not to sue, and release(s) and discharge(s) New Line, parent companies, affiliates, officers . . . from any and all claims.

---

[5] As in the Quitclaim, reference to "Company" appears to be a typographical error.  New Line is the payor of the Initial Option Payment, not Company.

. . of whatever nature . . ., whether known or unknown, which have ever existed or which do exist prior to or as of the execution of the agreements set forth in the Conditions Precedent in Amendment #1, . . . related in any way to the rights granted under the New Line/Warren Life Story Agreement, the Property, the Picture or any other rights or agreements related to the foregoing, including . . the Quitclaim Agreement, the Producer Agreement . . . Further, Company . . . waives any and all rights which Company may have with respect to this Quitclaim Agreement, or the subject matter hereof, under the provisions of Section 1542 of the Civil Code of the State of California . . . NL 102.

### 4.        Negotiations of Quitclaim and PLA

Alexander and then New Line Business and Legal Affairs Counsel Allison Strina negotiated the agreements with DeRosa-Grund and his attorney, John Gatti, an experienced entertainment attorney who was then a partner and chair of the Litigation Department at the Stroock, Stroock and Lavan law firm.   DeRosa-Grund testified that Gatti is listed in the 100 Hollywood SuperLawyers. The negotiations were extensive.   Alexander testified that the negotiation of the deal with DeRosa-Grund was one of the most heavily negotiated deals on which he had ever worked.    There were 10 drafts of the Quitclaim and five drafts of the PLA.    Strina testified that Gatti did not extensively negotiate the Grant of Rights provision in the Quitclaim, requested no changes to the Additional Payments provision, did not negotiate the standard integration clause, never asked that the arbitration clause be removed, never asked for language attaching DeRosa-Grund to sequels or prequels and did not request that any breach be "material."

Early in the negotiations, after DeRosa-Grund called Strina three or four times within a couple hours while she was unavailable. DeRosa-Grund left a voice mail message for Strina that she did not need to return his phone calls and that he would just see her in the parking lot.    Strina perceived the message as a threat of physical violence and decided going forward she would speak only with Gatti.

Strina understood from her conversations with Gatti, that DeRosa-Grund carefully reviewed the drafts and made many comments.

Alexander negotiated New Line's acquisition of the entire universe of rights except for specific rights, which were reserved.    He testified that he never had any discussion with DeRosa-Grund or Gatti regarding DeRosa-Grund being a producer on sequels or remakes of "The Conjuring" or regarding DeRosa-Grund being compensated for sequels or remakes. Gatti drafted the short form agreement which contained no language regarding DeRosa-Grund producing sequels or remakes.    NL 33.

### 5.        Negotiation of Quitclaim Amendment

In August 2010, Gary Barkin, an attorney representing Lorraine Warren, informed New Line that Warren had reviewed the purported "Life Story Option Purchase Agreement" and three purported amendments between DeRosa-Grund and her and confirmed that her signatures were falsified.    Accordingly, Barkin asserted that the forged agreements "are of no force or effect."    New Line understood that Warren's allegation created a significant cloud of title regarding her life rights

upon which the Quitclaim was based, posing significant risks to its investment.   NL 77.   Warren refused to enter into any direct deal with DeRosa-Grund.   NL 92.   New Line entered two agreements to resolve the cloud.   First, it entered the Life Story Option Purchase Agreement with Warren on December 7, 2009, by which it acquired her rights directly.   NL 117.   Second, it entered the Amendment to transfer certain of those rights back to DeRosa-Grund.   NL 102.

Strina and Gatti exchanged 14 drafts of the Amendment over a five month period.   New Line insisted on a broad release of rights in the Amendment because of numerous threats DeRosa-Grund had made to pursue civil and criminal actions against it.   DeRosa-Grund initially asked for $50,000 in consideration for the Release.   NL 103.

### D.        New Line Post-Agreements Performance

New Line entered an Assignment Agreement with Warner Bros. on January 1, 2010 to transfer its intellectual property rights to Warner Bros.   NL 40.

Prior to negotiation and execution of the Amendment, on April 16, 2010, New Line paid $75,000 to DeRosa-Grund and his entities as payment in full of the Initial Option Payment pursuant to Paragraph 2(a) of the Quitclaim.   NL 72.   After the Amendment resolved the chain of title cloud, New Line proceeded with production of "The Conjuring."   On February 8, 2011, New Line paid $25,000 to DeRosa-Grund and his entities as payment in full of the Advance pursuant to Paragraph 8 of the Amendment and as full payment of the second half of the Development Fee pursuant to Paragraph 4(b) of the PLA, as well as payment of $12,500 of Basic Compensation pursuant to Paragraph 4(b) of the PLA.   NL 116.   New Line also paid DeRosa-Grund and his entities eight weekly payments of $7812.50, totaling $62,500, for basic compensation during pre-production pursuant to Paragraph 4(b)(i) of the PLA.   NL 143.   In addition, New Line paid DeRosa-Grund and his entities $385,000 on February 1, 2012 as full payment of the Purchase Price less the Initial Option Payment and Third Party Rights Payments pursuant to Paragraph 4 of the Quitclaim.   NL 152.

Principal photography began in early 2012.   Safran was the on-set creative producer. DeRosa-Grund visited the set once. "The Conjuring" was released in July 2013.   It has grossed over $300,000,000.

On October 3, 2014, New Line released "Annabelle" as a motion picture.   It has grossed over $200,000,000.   New Line originally developed "Annabelle" as a direct-to-video release.   After a positive test screening in June 2014, Hamada, New Line's Senior Vice-President of Production, submitted "Annabelle" to New Line's greenlight committee, which approved it for theatrical release. New Line invested more money in "Annabelle" and shot six additional days of footage.   Once it decided to release "Annabelle" theatrically, New Line paid DeRosa-Grund $750,000.

### E.        DeRosa-Grund Post-Agreements Performance

#### 1.        Trademark Applications

On March 21, 2012 and May 3, 2012, DeRosa-Grund filed intent to use trademark applications with the United States Patent and Trademark Office (USPTO) for "The Conjuring"

covering graphic novels, video games, clothing, board games, comics and entertainment services, which included a television series and motion pictures.    NL 161, 162, 171 & 172.    DeRosa-Grund disclosed these filings to New Line on September 18, 2012.    NL 192.    DeRosa-Grund also stated to New Line that he owned the trademark "The Conjuring" and that New Line could not use "The Conjuring" as the title to the motion picture without a licensing agreement with him.    *Id.*    He demanded that New Line remove the title from its test screening of the film that week.    *Id.*

New Line rejected DeRosa-Grund's demands and gave notice to Gatti that it would oppose DeRosa-Grund's trademark applications and seek its attorneys' fees.    NL 211.    It engaged trademark counsel to bring an opposition proceeding before the USPTO.    NL 239.    The Trademark Trial and Appeal Board granted New Line's Motion to Suspend the Trademark Process on July 29, 2013.    NL 272.    Thereafter, DeRosa-Grund abandoned his Applications.    NL 294.    New Line incurred $12,431 in attorneys' fees and costs.    NL 240, 254, 275, 301, 303, 308 and 333.

### 2.     Negotiations with Lionsgate to Produce Television Series

At the end of DeRosa-Grund's September 18, 2012 email to Alexander, he wrote: " . . . I am told that I am supposed to notify you – as per the contract between us, that we are selling the TV rights we enjoy as reserved rights.    My understanding is that we will probably have a "THE CONJURING" show on the air for next summer or fall's cycle at the latest.    Forgive me but I thought John was going to notify you yesterday about the TV series deal but since he is busy with other matters I am making the notification to you directly."    NL 192.    New Line responded to DeRosa-Grund that day, stating that he did not have any rights in "The Conjuring" and thus could not sell television rights.    NL 193.

On Friday, December 21, 2012 at 7:47 pm, Gatti emailed Alexander "confirming that several weeks ago prior to Thanksgiving Tony . . . notified New Line in writing that Evergreen Media had received an offer for the television rights for The Conjuring . . . Tony never received any written response to this notice.    I spoke with you shortly after Evergreen Media's notice of television rights offer was sent to New Line to discuss New Line's response if any to Evergreen's notice.    You confirmed to me that New Line had no interest . . . and that New Line would not match any television rights offer received by Evergreen Media . . ."    NL 208.

Alexander did not see Gatti's email until he returned from the holiday break on Monday, January 7, 2013.    Neither Gatti nor DeRosa-Grund at that time informed Alexander or anyone at New Line that DeRosa-Grund and Lionsgate, a film and television production company, executed a Term Sheet, as of January 3, 2013, revised January 9, 2013, whereby Lionsgate would purchase DeRosa-Grund's rights in "The Conjuring."    NL 209.

New Line learned about DeRosa-Grund's deal with Lionsgate in early May 2013.    On May 20, 2013, Amar of New Line informed legal counsel at Lionsgate that New Line owned all right, title and interest in "The Conjuring" picture and retained exclusive rights in the case file on which it is based.    Amar demanded that Lionsgate abandon use of "The Conjuring" title for the television series. NL 222.    According to DeRosa-Grund, Lionsgate relinquished its rights in the television series as of September 11, 2013.    NL 298.

14

On December 12, 2013, Gatti notified New Line's counsel that notwithstanding New Line having waived its rights of first negotiation/last refusal based on "the parties prior dealings," DeRosa-Grund was notifying New Line of its intent to negotiate with a third-party for the license of reserved television series rights.    NL 307.    The notice requested a response by December 16, 2013. NL 307.    New Line responded on December 18, 2013 that it was exercising its right of first negotiation and was very interested in acquiring the television rights.    NL 310.    DeRosa-Grund informed New Line on December 19, 2013 that he had no desire to dispose of his reserved television rights.    NL 313.    Then, on January 6, 2014, DeRosa-Grund informed New Line that the 30 day "negotiation window" expires on January 11, 2014.    New Line wrote Gatti on January 7, 2014 that it would meet the same terms as set forth in the DeRosa-Grund – Lionsgate Term Sheet.    NL 316. DeRosa-Grund withdrew the offer.    NL 317.

In the course of his negotiations with Lionsgate, DeRosa-Grund disclosed to Lionsgate certain audience testing scores and the confidential planned release date for "The Conjuring".    NL 206 & 215.

### 3.        Registration of Sequel Titles with MPAA

On May 16, 2013, DeRosa-Grund registered ten sequel titles for "The Conjuring" with the Title Registration Bureau of the Motion Picture Association of America (MPAA).    NL 220.    New Line filed protests to each of the titles and registered its own titles, which DeRosa-Grund protested. MPAA rules prohibited use of the registered titles until the protests were resolved.    DeRosa-Grund withdrew his registrations, effective September 30, 2013.    NL 298.

### 4.        The Demonologist Option

DeRosa-Grund entered an option agreement with Gerald Brittle, the author of a book entitled *The Demonologist: The Extraordinary Career of Ed and Lorraine Warren*.    NL 1.    According to DeRosa-Grund, this option granted him motion picture rights in Brittle's book, including a chapter entitled "Annabelle."    NL 1.    DeRosa-Grund has not provided New Line a copy of the option agreement.    DeRosa-Grund sold his purported rights in Brittle's book to film producer Paul Rock, who threatened to enjoin New Line from releasing its motion picture "Annabelle".    NL 357.    New Line has tendered to DeRosa-Grund a demand that DeRosa-Grund indemnify it against Rock's threat. NL 358.    DeRosa-Grund refused New Line's demand.    NL 364.    New Line has incurred $22,779 in attorneys' fees in connection with Rock's threat.    NL 362.

### 5.
### REDACTED

### 6.        Case Files

New Line on April 10, 2014 demanded that DeRosa-Grund provide it all of the approximate 8000 Case Files.   NL 327.    DeRosa-Grund contended that he had previously satisfied his obligation by providing to New Line the 25 case files New Line had selected and furthermore, that a "well-documented" fire at his home destroyed "materials he created in connection with the Warren files..   NL 328.

### 7.        Texas Federal Court Lawsuits

DeRosa-Grund filed a federal lawsuit against New Line and Warner Bros. in the U.S. District Court for the Southern District of Texas on March 28, 2014.    This suit (First Texas Lawsuit) pled causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against New Line and for tortuous interference with business relations, fraud in the inducement, promissory estoppel, conversion, declaratory relief and violation of Section 43(a) of the Lanham Act against both New Line and Warner Bros.    NL 325.

New Line filed a motion to stay or dismiss the First Texas Lawsuit pursuant to the Federal Arbitration Act because this Arbitration was pending.    The Court granted New Line's motion to dismiss on the ground that all of DeRosa-Grund's causes of action arise out of the Agreements subject to arbitration clauses and should be decided in this Arbitration.    NL 373.

DeRosa-Grund filed a second lawsuit in the U.S. District Court for the Southern District of Texas on April 23, 2014, alleging claims regarding "The Conjuring".    He voluntarily dismissed this suit (Second Texas Lawsuit).

New Line tendered a demand for defense and indemnification to DeRosa-Grund for its legal fees and costs incurred in defending against the First and Second Texas Lawsuit.    NL 335. DeRosa-Grund refused.    New Line has incurred approximately $72,301 in attorneys' fees in defending against the Texas Lawsuits.    NL 332 & 360.

### 8.        Other Acts

DeRosa-Grund made numerous threats against New Line.    He threatened to engage in his own "independent publicity."    NL 248.

REDACTED

On October 8, 2010, DeRosa-Grund sent an email to Alexander, which stated, among other things, that he would not stand for his intellectual property being stolen, that whole passages in the scripts were lifted from his work and that he would return to the U.S. Attorney to address the issue.

### F.        Fees and Costs

New Line advanced $49,498.63 in behalf of DeRosa-Grund for JAMS arbitration fees.    NL 361.   New Line also paid $11,148.43, representing one-half the costs of the stenographic record.

G.        **Prejudgment Interest**

At a 7% per annum rate, the prejudgment interest on New Line's $107,511 damages amounts to $4117.56.

III.        **DISCUSSION**

A.        **The Pleadings**

New Line filed a Demand for Arbitration Before JAMS against DeRosa-Grund and his entities on June 5, 2013 and an Amended Demand on June 18, 2013.     The Demand and Amended Demand alleged claims for breach of contract and interference with trademark, intellectual property and other rights.     The breach of contract claim alleged that in violation of applicable agreements, Respondents filed Federal Trademark applications, registered titles with the MPAA and entered an agreement with Lionsgate to produce a television show entitled "The Conjuring".     New Line sought declaratory relief and an award of attorneys' fees and costs.

DeRosa-Grund and the entity Respondents filed an Amended Response to the Amended Demand on September 3, 2013.     The Amended Response generally denied all allegations, presented six affirmative defenses and asserted four counterclaims for breach of written contract and breach of the implied covenant of good faith and fair dealing against New Line and for intentional interference with economic relations and declaratory relief against New Line and Warner Bros.     DeRosa-Grund sought compensatory damages, declaratory relief and attorney fees and costs.     On December 19, 2013, DeRosa-Grund filed a Second Amended Response to the Amended Demand that, among other things, added claims for fraud in the inducement and promissory estoppel against New Line and prayed for rescission.

On September 18, 2013 New Line and Warner Bros. generally denied the original Counterclaim and presented 27 affirmative defenses.     On May 5, 2014, New Line filed an Answer to the Second Amended Counterclaim.     On January 17, 2014 and on May 30, 2014, New Line filed a Second Amended Demand for Arbitration, which among other things, added a claim for specific performance that DeRosa-Grund provide New Line an opportunity to exercise its right of last refusal regarding the Lionsgate deal.     DeRosa-Grund filed a Response to the Second Amended Demand on July 15, 2014, which asserted nine affirmative defenses and added counterclaims against both New Line and Warner Bros. for fraud in the inducement, promissory estoppel, conversion and violation of Section 43(a) of the Lanham Act and against New Line for fraud.

New Line asserted 43 affirmative defenses to what it termed DeRosa-Grund's Third Amended Counterclaims.

B.        **Applicable Law**

California law, the JAMS Comprehensive Arbitration Rules and Procedures (JAMS Rules) and the Federal Rules of Evidence govern this Arbitration.

The following is a summary of the relevant law that is applicable to the contested issues. Law that is not necessary to decide a contested issue is omitted.

A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.   *Ben-Zvi v. Edmar Co.* (1995) 40 CA4th 468, 472-473.    Expressed objective intent, not unexpressed subjective intent, governs. *Vaillette v. Fireman's Fund Insurance Co.* (1993) 18 CA4th 680, 686.    "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Civil Code §1638.    "(I)ntention must be ascertained from the words used, after taking ino consideration the entire contract and the circumstances under which it was made."   *Moss Development Co. v. Geary* (1974) 41 CA3d 9.    "The words of a contract are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."    CC §1644.    Courts must give significance "to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage."    *In re Tobacco Cases I* (2010) 186 ca4th 42, 49.

"The rule is well settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent."    *Southern California Edison Co. v. Superior Court* (1995) 37 CA4th 839, 851.    In determining mutual intent, a court should give great weight to the subsequent conduct of the parties.    Pre-dispute, post-contracting conduct is admissible to demonstrate an ambiguity . . . and may reveal what the parties understood and intended those terms to mean.    *Cedars-Sinai Medical Center v. Shewry* (2006) 137 CA4th 964, 983.

"The correct rule (of California law) with reference to the admissibility of evidence as to trade usage . . . is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, . . . yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage.    Parol evidence is admissible to establish the trade usage . . ." *City Savings and Loan Association v. General Insurance Co. of America* 386 F. Supp. 1210, 1217 (N. D., Cal. 1974).    "For evidence of custom to have potency it must be established that the parties to the contract were aware of the existence of the custom" and manifest their assent.    *Id.*, at 1218.

Extrinsic evidence is properly admissible to construe a written agreement only when the language is ambiguous and the evidence "is relevant to prove a meaning to which the language is reasonably susceptible."    *Winet v. Price* (1992) 4 CA4th 1159, 1165.

Interpretation of an assignment is determined as any contract.    *Mission Valley East, Inc. v. County of Kern* (1981) 120 CA3d 89, 96.    An assignment is valid if its language is "clear and positive." *Id.*

A broad integration clause bars extra-contractual promises regarding the agreement's subject matter and, accordingly, defeats an otherwise viable promissory estoppel claim based on the extra-contractual promises.    *AMC Teechnology, LLC v. Cisco Systems, Inc.*, 2012 WL 174949 (N.D.

Cal.).

A plaintiff suing for breach of contract must prove he performed all conditions on his part or was excused from performance.    *Consolidated World Investment, Inc. v. Lido Preferred, Ltd.* (1992) 9 CA4th 373, 380.    A party to a contract seeking to hold the other party to the contract's obligations must first perform all conditions precedent.    CC §1439; *Pry Corporation of America v. Leach* (1960) 177 CA2d 632, 639-640.

"Every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."    *Wolf v. Superior Court* (2003) 107 CA4th 25, 31.    The implied covenant cannot contradict the express terms of the contract.    *Carma Developers, Inc. v. Marathon Development California, Inc.* (1992) 2 C4th 342, 374.

An obligation to indemnify against claims, demands or liability includes the costs of defense incurred in good faith and in the exercise of reasonable discretion.    CC §2778(3). Whether an indemnity provision covers a particular case turns on contract interpretation.    *Zalkind v. Ceradyne, Inc.* (2011) 194 CA4th 1010, 1024.    The general rule that the term "indemnity" covers only third party claims does not apply "if the parties . . . use the term . . . to include direct liability as well . . . " *Id.*

"At common law, the exclusive right to (a trademark) grows out of its *use*, and not its mere adoption."    *In re Trade-Mark Cases*. 100 U.S. 82, 94.    A pitch to sell an idea to potential investors is not analogous to the sale of a trademark, which requires "prior use of the mark in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."    *Keane v. Fox Television Stations, Inc.* 297 F. Supp. 2d 921 (S.D. Tex. 2004), *affirmed Keane v. Fox Television Stations, Inc.*, 129 Fed. Appx. 874 (5th Cir. 2005).    The use must be continuous.    *Spin Master, Ltd. v. Zobmondo Entertainment, LLC*, 944 F. Supp. 2d 830, 851 (C.D. Cal. 2012).

"(A)ttempts to sell . . . property to a third party without adequate notice and opportunity to exercise the preemptive right of first negotiation constitute breach of contract enforceable by specific performance.    *Campbell v. Alger* (1999) 71 CA4th 200, 206.    Even if money damages would be sufficient compensation, it is proper to grant specific performance where the parties have agreed to such a remedy.    *DVD Copy Control Association, Inc. v. Kaleidescope, Inc.* (2009) 176 CA4th 697, 725.

"A cause of action for conversion requires allegations of plaintiff's ownership or right to possession of property; defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff.    Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved . . ." *PCO, Inc. v. Christiansen, Miller, Finnk, Glaser, Weil & Shapiro* (2007) 150 CA4th 384, 395.

The elements of a cause of action for interference with contract are: (1) plaintiff had a valid and existing contract; (2) the defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by the defendant's unjustified or wrongful conduct; and (5) the plaintiff has suffered damage.    *Dryden v.*

*Tri-Valley Growers* (1977) 65 CA3d 990, 995.     Justification is an affirmative defense to tortuous interference.     *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 CA3d 13, 18.

Section 43(a) of the Lanham Act forbids the use of false designations of origin and false descriptions or representations in the advertising and sale of goods and services.     15 USC §1125(a). The phrase "origin of goods" in §43(a) refers to "the producer of tangible goods offered for sale, not to the author of an idea embodied in the goods." *Dastor Corp v. Twentieth Century Fox Film Corp.*, 539 US 23, 37 (2003).

A court may issue a declaration of rights "in cases of actual controversy relating to the legal rights and duties of the respective parties."     CCP §1060.     "The purpose of declaratory relief is to liquidate uncertainties and controversies which might result in future litigation and whether a determination is proper . . . is a matter within the trial court's discretion."     *Interstate Marina Development Co. v. County of Los Angeles* (1984) 155 CA3d 435, 443.     It is available even when the disputed contract has already been breached.     *Columbia Pictures Corp. v. De Toth* (1945) 26 C2d 753, 761.

Challenges to JAMS jurisdiction are waived unless asserted in a response to a Demand, or shortly thereafter when circumstances first suggest an issue of arbitrability.     JAMS Rule 9(f).     "A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act."     *Ficek v. So. Pacific Co.*, 338 F.2d 655, 656-657 (9th Cir. 1964).     An arbitration agreement may be unenforceable if it is both procedurally and substantively unconscionable.     *Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 C4th 83, 113-114.

## C.     Analysis

This analysis addresses only the central issues and determinations which the Arbitrator considers necessary to decide this case.

The essence of this dispute is interpretation of the Quitclaim, its Amendment and the PLA. New Line contends that these fully integrated Agreements are unambiguous.     DeRosa-Grund argues that the Agreements either should be interpreted in light of certain oral representations or strictly according only to their express terms.

### 1.     Witnesses

The credibility of the witnesses who negotiated the Agreements bears on interpretation of the Agreements.     The most important percipient witnesses were Alexander, DeRosa-Grund, Gatti and Strina.

Alexander is a smart, experienced entertainment industry executive.     He was knowledgeable about the industry and fully familiar with the negotiations of these Agreements and related business matters.     His frustrations with DeRosa-Grund were evident notwithstanding his controlled testimony.     His answers were direct and consistent with the documentary evidence. His demeanor raised no questions.     Overall, Alexander's testimony was entirely credible.

DeRosa-Grund said that he felt well enough to testify.    His answers were articulate, coherent and subject matter responsive.    Perhaps DeRosa-Grund's absence impaired slightly the Arbitrator's perceptions of his credibility, as it was not possible to observe his demeanor.    However, inconsistencies between testimony and demeanor typically reveal negative attributes, so to the extent his absence had any impact, it likely did not disadvantage him.    More relevant to DeRosa-Grund's credibility was what he testified and the evidence, particularly regarding his behavior.    Much of his testimony seemed calculated.    Of particular concern was his testimony regarding his telephone conversation with Alexander on December 1, 2009, in which DeRosa-Grund alleged Alexander promised that he would be "locked for life."    This point was extremely important to DeRosa-Grund, yet there was no evidence to corroborate his version of the conversation – no testimony by Gatti that DeRosa-Grund informed him of this major development, no confirmation email to Alexander, no communication with his co-producer Safran.    To the contrary, DeRosa-Grund explained the absence of corroboration by stating "We trust people here in Texas."    Such a gratuitous, meaningless statement was unconvincing, especially by an intelligent, experienced entrepreneurial businessman. The credibility of DeRosa-Grund's stated belief that the Agreements did not transfer all his rights to New Line is severely undercut by the fact that in a February 2009 agreement, which he executed, he used the identical words "all right, title and interest" to transfer all the rights in "The Conjuring," including trademark rights from Silverbird to Evergreen Media, even though the term "trademark" did not appear in the agreement.    NL 11.    Also disturbing and undermining of DeRosa-Grund's credibility was the vast documentary and testimonial evidence of his hostile, threatening, angry personality.    He made numerous threats to New Line executives, but rarely followed through on them, which indicates that the threats may have been calculated attempts to manipulate.    There is ample evidence in this matter other than DeRosa-Grund's lack of credibility to reach the conclusions set forth below, but his non-credibility surely reinforced the conclusions.

Gatti is an impressive, highly experienced and accomplished entertainment attorney.    He recalled many details regarding the negotiation of the Agreements.    He testified responsively and coolly.    Some of his answers appeared to reflect the difficulty that, as DeRosa-Grund's past attorney, he had to defend a client whose legal position was weak.    For example, he testified that DeRosa-Grund's September 18, 2012 email to Alexander fulfilled his obligations to give New Line its right of last refusal when he wrote at the end of a long email regarding other subjects: "BTW – speaking of money.    I am told that I supposed to notify you . . . that we are selling the TV rights we enjoy as reserved rights.    My understanding is that we will probably have a "THE CONJURING" show on the air for next summer or fall's cycle at the latest.    Forgive me but I thought John was going to notify you yesterday about the TV series deal but since he is busy with other matters I am making the notification to you directly."    NL 192.    Such a non-specific, throwaway paragraph hardly fulfills the First Refusal/Last Negotiation provision in ¶8(c) of the Quitclaim or the Amendment, yet Gatti was stuck defending his client's position.    There were other instances when Gatti's testimony was unconvincing due to DeRosa-Grund's weak position.    Gatti testified that when he withdrew from representing DeRosa-Grund, his client owed him and Stroock a significant amount of fees, over "six figures."    He further testified that he and DeRosa-Grund had no "specific understanding" that if DeRosa-Grund recovered anything in this arbitration, he would use that to pay down his debt owed to Stroock.    Given DeRosa-Grund's aggressive litigation tendencies and his testimony that he learned about certain "troubling allegations" implicating Gatti for the first time at the Arbitration Hearing, Gatti may well have concerns that DeRosa-Grund might initiate a malpractice action against him,

although nothing in this arbitration indicates that such an action would be justified.    Compromised by his past representation of DeRosa-Grund, Gatti was not a convincing witness.

Strina was an earnest, credible witness.

The credibility of the remaining percipient witnesses was not at issue.    Amar succeeded Strina after the Amendment was negotiated.    She seemed to be a competent entertainment attorney. Her testimony regarding DeRosa-Grund's Lionsgate deal was credible.    Barkin seemed objective and had no apparent stake in the outcome of this matter.    Checho's testimony was pointless.    Hamada was an impressive, straightforward witness.    Levin was a minor witness.    Perkins is an impressive, knowledgeable trademark attorney.    Young's testimony about arrangements she made for DeRosa-Grund at the premiere and about DeRosa-Grund's hostility and accusations was entirely credible.

Wyman was the sole expert witness.    He has an extensive 30 year history as a transactional entertainment attorney, specializing in television and film.    He was head of Business and Legal Affairs at New World Entertainment and practiced at the Rosenfeld, Meyer & Susman law firm before opening his own firm, Wyman & Isaacs.    He has testified as an expert witness for and against studios in several cases regarding such transactional issues as custom and practice regarding acquisition of rights agreements.    His principal testimony was as follows:
1. The phrase "All rights, title and interest" is used all the time in the entertainment industry and means everything you have and everything there is.
2. The term "Property" in the Quitclaim is catch-all language intended to include all rights, including trademarks, copyrights, screenplays.    The reason studios insist on such broad language is because they want to make sure they acquire all rights.
3. The one-sided injunctive relief language in the Quitclaim is standard in the industry because studios invest millions of dollars to produce, market and distribute films and want no risk of interference.
4. In the entertainment industry, the terms "element" and "aspect" mean anything that encompasses the underlying story, such as the story, the characters, the title, the locale.
5. The custom and practice in the entertainment industry is that all terms are contained in a long form agreement and so that are no other written or unwritten agreements.
6. "Locked for life" is always a negotiated term and it is used more in television than films.
7. The phrase "all results and proceeds" in the PLA means whatever is created and worked upon by performance of the contracted services.
8. "Work for hire" is a term from the Copyright Act, which has been adopted in the entertainment industry and means that all product of the work is owned by the studio.
9. A "pay and play" provision is extremely uncommon because studios want to be able to remove a troublesome director.
10. The right to work on sequels is a negotiated term.
11.    REDACTED    would be encompassed by the term "any and all rights and interests . . . hereafter" and would fall within the PLA "work for hire" provision, as would The Demonologist.                              REDACTED

Not only was Wyman extremely impressive, knowledgeable and credible, his testimony regarding the meaning of entertainment industry custom and practice made sense.

### 2.            Standing

Warner Bros. has standing in this arbitration.    In ruling on DeRosa-Grund's Motion for Leave to Take Additional Discovery, which in part sought to depose a person most knowledgeable from Warner Bros., Justice Neal stated that adding Warner Bros. as a party "appears . . . to be sensible and fair to both sides" because Warner Bros. is the assignee of rights in New Line's intellectual property, including the copyright to "The Conjuring", and would be bound by the outcome of the arbitration.    Order Re Motions, August 20, 2014.    Moreover, Warner Bros. is expressly identified as the entity that would distribute the Picture and manage accounting to DeRosa-Grund in Exhibit A to the Quitclaim and Exhibit A to the PLA.    NL 26 & 27.

### 3.            Arbitrability

DeRosa-Grund on his own and in behalf of his controlled entities, executed the Quitclaim and PLA, which contain explicit arbitration clauses.    In negotiating the agreements, he was represented by experienced, competent counsel, who kept him informed of the terms. DeRosa-Grund had entered numerous prior agreements containing arbitration clauses.    He is sophisticated and business-savvy.

DeRosa-Grund argues that the arbitration agreements are procedurally and substantively unconscionable.    This objection is untimely and waived, and furthermore, it is groundless. DeRosa-Grund has participated in this arbitration since filing his initial Response, his Amended Response and Counterclaims and Second Amended Response and Counterclaims.    He has filed discovery and numerous other motions seeking affirmative relief against New Line, including a motion requesting interim relief.    It is long past the time for him to argue that this arbitration is the improper process for resolution of the disputes between the parties.    Any grounds to object are waived.

Even if DeRosa-Grund had not waived his objections, he has no basis to challenge this arbitration on unconscionability grounds.    The agreements were extensively negotiated at arms-length, which negates any basis for procedural unconscionability.    The one-sided injunctive relief provisions in the arbitration clause are standard in the entertainment industry, and hence, cannot be considered to be substantively unconscionable.

### 4.            Interpretation of the Agreements

The Quitclaim and PLA clearly, repeatedly, consistently and unequivocally grant all rights to "The Conjuring" project, including all copyright and trademark rights, to New Line, except as quitclaimed or assigned back to DeRosa-Grund.    This is what the words say and how the entertainment industry does business.    On their face, even to a layperson, the terms "all right, title and interest" and "any and all rights and interest of any type and nature whatsoever heretofore or hereafter acquired" appear to be all-inclusive.    There are numerous infinity-like terms in the agreements used to describe the intellectual property acquired by New Line, such as:

Quitclaim ¶1A:   PROPERTY: "any and all literary material" including "the entire case file library (approximately 8000 case files)", "any and all right, title and interest" to entire the

Warren life stories, "any and all rights and interests of any type and nature heretofore or hereafter acquired" by DeRosa-Grund.    "Property" means the Literary Material, the Life Rights, Other Rights and the Agreements.

Quitclaim ¶3:    <u>QUITCLAIM</u>: DeRosa-Grund quitclaims to New Line all "right, title and interest, excluding only the Reserved Rights" to the Property.

Quitclaim ¶7:    <u>GRANT OF RIGHTS</u>: DeRosa-Grund conveys to NewLine "exclusively, in perpetuity and throughout the universe, the entire copyright . . . and all right, title and interest in the Property except for the Reserved Rights.    The Rights in the Property include "all copyrights . . . trademarks."

PLA ¶9:    <u>RIGHTS</u>: All results of every kind of the services to be rendered by DR in connection with the Picture shall be deemed "works for hire" for NL.    "Accordingly, (New Line) is . . . the sole and exclusive owner of the Material and all right, title and interest therein.    The Rights shall include . . . all copyrights . . . trademarks and any and all other ownership and exploitation rights in the Material now or hereafter . . . including the right to exploit the Material throughout the universe in perpertuity in all media . . . "

It is unsurprising that such terms have been adopted as the custom and practice in the entertainment industry when a production company, studio or distributor seeks to acquire intellectual property rights, and especially so when the acquiring party is a studio that plans to spend millions of dollars to exploit the property.    It is noteworthy that even DeRosa-Grund himself recognized that such terminology transfers absolutely everything when he drafted and executed a transfer of all rights from one of his entities to another.    Any other interpretation of the Agreements would be absurd.

By contrast, the language regarding DeRosa-Grund's reserved or quitclaimed rights is narrow and limited.

### 5.    Breaches of the Agreements

#### a.    Trademark Applications

DeRosa-Grund had no right to file "intent to use" applications with the USPTO for the trademark in "The Conjuring" because he already had conveyed those rights to New Line in the Quitclaim and its Amendment.    His action clearly breached those agreements.    Although DeRosa-Grund later abandoned his improper applications, New Line incurred attorneys' fees to oppose the applications.

DeRosa-Grund held or retained no trademark rights in "The Conjuring."    He had not continuously used any such a mark sufficient to establish a common law right and, even if he had a common law trademark right, he transferred it by agreeing to the unambiguous provisions of the Quitclaim and PLA.

#### b.    Lionsgate Negotiations

24

DeRosa-Grund never gave New Line written notice that he proposed to negotiate with Lionsgate regarding licensing of "The Conjuring" for a television series.    DeRosa-Grund's September 18, 2012 email gave notice of his intent to "sell" the television rights and informed New Line that the program would air in approximately one year.    This email was not written notice that he proposed to negotiate; rather it was notice that there was a done deal.    Likewise, Gatti's eve-of holiday break December 21, 2012 email to Alexander confirmed receipt of an offer for television rights, again not notice of a proposal to negotiate.    DeRosa-Grund's failure to give New Line first negotiation notice breached the Quitclaim.

Nor did DeRosa-Grund give New Line written notice of the proposed terms of its agreement with Lionsgate.    Those proposed terms were set forth in a Term Sheet, dated January 9, 2013.    However, DeRosa-Grund did not provide the proposed terms of its agreement with Lionsgate until sometime in December 2013 following a mediation session.    At about that same time, Gatti gave New Line purported "first negotiation" notice, but when New Line responded to exercise those rights, DeRosa-Grund rejected the idea of disposing his reserved television rights and later withdrew New Line's offer to meet the Lionsgate Term Sheet.    DeRosa-Grund's failure to give New Line proper last refusal notice breached the Quitclaim.

DeRosa-Grund's breach of the first negotiation/last refusal provision damaged New Line by depriving it from acquiring and exploiting the rights in the television series.    New Line is entitled to exercise its right to acquire the rights to the television series on the same terms as DeRosa-Grund negotiated with Lionsgate.    An order that DeRosa-Grund specifically perform is appropriate.

### c.    MPAA Title Registration

Lacking any right to do so, DeRosa-Grund registered ten film sequel titles with the MPAA for "The Conjuring".    So long as those registrations were active, New Line could not promote any sequel to the original.    The filings breached the Quitclaim.    Although DeRosa-Grund withdrew the registrations, New Line suffered damages due to the delay in promoting sequels and the attorneys' fees it incurred in protesting DeRosa-Grund's registrations and responding to DeRosa-Grund's protests to its subsequent competing registrations.

### d.    Case Files

New Line on April 10, 2014 demanded that DeRosa-Grund deliver to it all of the Case Files, as encompassed within the definition of "Property" in ¶1A of the Quitclaim.    DeRosa-Grund has not delivered the Case Files, explaining by implication that the Case Files were destroyed in a well-documented fire.    DeRosa-Grund provided no evidence to support this explanation, but it is not his burden to do so.    It is New Line's burden to provide evidence that DeRosa-Grund possessed the files at the time it demanded their production.    In the absence of any such evidence, New Line has not met its burden to prove that DeRosa-Grund breached the Quitclaim when he failed to turn over the Case Files.

### 6.    Breach of the Implied Covenant of Good Faith and Fair Dealing

DeRosa-Grund's contract breaches also constitute breaches of the implied covenant of good faith and fair dealing.   Although DeRosa-Grund's failure to produce the 8000 Case Files did not breach the Quitclaim, he knew that New Line had acquired the Case Files and thus his failure to give New Line notice of their purported destruction by fire deprived New Line the opportunity to independently investigate and pursue potential other remedies to protect its interest, and thereby breached the implied covenant.

DeRosa-Grund breached the implied covenant of good faith and fair dealing in other ways. His refusal to indemnify New Line against his First and Second Texas Lawsuits also breached the implied covenant.   Paragraph 11 of the Quitclaim obligates DeRosa-Grund to indemnify New Line against all claims arising out of his breach of the agreement.   By initiating the Texas Lawsuits, DeRosa-Grund breached his covenant not to sue New Line for any claims arising prior to execution of the Amendment.

DeRosa-Grund disclosed highly proprietary, confidential information about "The Conjuring" to Lionsgate, including audience test scores and the confidential planned release date. This conduct breached the Quitclaim and also the implied covenant of good faith and fair dealing.

DeRosa-Grund's numerous, hyperbolic threats may constitute extortion, but absent evidence that he carried out any of them, New Line cannot prove that such conduct deprived it of the fruits of the agreements.   Hence, such conduct, however deplorable, did not breach the implied covenant.

### 7.        Declaratory Relief

There is no doubt that there is an actual controversy between the parties relating to their rights under the agreements.   To eliminate uncertainties which might result in future litigation, it is appropriate that the Arbitrator exercise discretion to make the following declarations consistent with the findings in §IIIC4, *supra* and in §10, *infra*, and based on the express terms of the Agreements:

(1) DeRosa-Grund has no right, title or interest to and must cease and desist from using the title "The Conjuring," including but not limited to using the title "The Conjuring" in connection with any television series.

(2) DeRosa-Grund has no trademark rights in the title "The Conjuring."

(3)                                    REDACTED


(4) Any rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights with respect to the Demonologist Option.

(5) Any rights acquired by DeRosa-Grund under any agreements with third parties related to the "Property" as that term is defined in the Agreements are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights.

(6) DeRosa-Grund retained no rights whatsoever in "The 'Conjuring" project other than

those specifically reserved pursuant to the terms of the Agreements.

(7)  Any rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements.

(8)  DeRosa-Grund has no right under the Agreements to be attached as a producer to any sequel, prequel, spin off, or remake of the Picture, including but not limited to the motion pictures currently entitled "The Conjuring 2" and "Annabelle".

(9)  Claimants have a right to produce direct-to-video productions under the Agreements, and DeRosa-Grund is not entitled to any payment under Paragraph 5(b) of the Quitclaim Agreement for any direct-to-video productions.

(10) DeRosa-Grund is not entitled to any additional payment in connection with the motion picture "Annabelle" beyond the $750,000 that Claimants have already paid him.

(11) As a result of DeRosa-Grund's breaches of the Agreements, he is not entitled to any contingent compensation under Paragraph 5 of the Quitclaim or Paragraph 5 of the PLA, including but not limited to "contingent deferment" (i.e., box offices bonuses) and profit participation.

(12) Claimants have not waived their Rights of First Negotiation/Last Refusal under Paragraph 8(c) of the Amendment to the Quitclaim, all of which remain in full effect/

(13) Claimants are entitled to accept the Lionsgate television series deal on the same monetary terms as set forth in the Lionsgate Term Sheet.

(14) New Line owns all right, title and interest to the approximately 8000 case files and other materials referenced in Paragraph 1A of the Quitclaim.

## 8.        Counterclaims

For the most part, determination of DeRosa-Grund's counterclaims depends on interpretation of the Agreements.    This analysis first discusses the Release contained in the Amendment and then addresses individual counterclaims.

## 9.        The Release

The Release contained in the Amendment is broad and unambiguous.    It expressly releases New Line from "any and all claims . . . whether known or unknown . . . arising from or relating in any way to the rights granted under the New Line/Warren Life Story Agreement, the Property, the Picture [*The Conjuring*] or any other rights or agreement related to the foregoing, including the Quitclaim, the PLA and the Certificate of Employment for the Picture."    DeRosa-Grund was represented by competent and experienced counsel, who extensively negotiated the Amendment and who kept DeRosa-Grund fully informed.

The Release bars any claim by DeRosa-Grund against New Line arising from anything that occurred prior to execution of the Release on February 7, 2011.    The following counterclaims are barred because they are based on actions that occurred prior to that date:

-  Count III for fraud in the inducement, which is based on the allegation that Alexander made certain oral representations to DeRosa-Grund on December 1, 2009, including that he would be "attached" as producer to any film based on the Case Files, to induce him to enter the Quitclaim and the PLA.

- Count IV for promissory estoppel, which is based on the same allegations as Count III.
- Count VI for intentional interference with economic relations, which is based on the allegation that New Line interfered with the Warren agreements by entering the New Line/Warren Life Story Agreement on December 7, 2009.
- Count VII for fraud, which is based on the allegation that New Line misrepresented that DeRosa-Grund's rights under the Amendment would not change the rights he had under the Quitclaim.
- Count X for violation of Section 43(a) of the Lanham Act, which is based on the allegation that New Line improperly refused to submit DeRosa-Grund for writing credit determination to the WGA, which was first raised by DeRosa-Grund in October 2010.

### 10.        Individual Counterclaims

#### a.        Breach of written contract

This claim alleges that New Line breached the Agreements by failing to timely select specific Case Files, by filing applications to register "The Conjuring" trademark with the USPTO and MPAA, by failing to pay additional payments and contingent compensation, by failing to provide periodic statements or profit participation payments and failing to timely and fully pay the Purchase Price for "Annabelle".    He seeks damages for these breaches as well as termination of the Quitclaim because New Line failed to pay additional compensation.

DeRosa-Grund breached the Agreements.    Therefore, he did not perform all his obligations and cannot establish all the elements of breach of contract against New Line.    Moreover, New Line did not breach any of its obligations.    First, neither the Quitclaim or the Amendment obligated New Line to select Case Files by a particular date.    Second, New Line owned all trademarks and therefore it, not DeRosa-Grund, had the sole right to file applications to register "The Conjuring" trademark.    Third, the Agreements expressly allowed New Line to withhold paying additional payments and contingent compensation to DeRosa-Grund if he was in default of either the Quitclaim or the PLA, and breaches of either the Quitclaim or the PLA were deemed breaches of the other. Fourth, DeRosa-Grund failed to present evidence establishing that New Line failed to provide periodic statements or profit participation payments.    Fifth, New Line did pay DeRosa-Grund the Purchase Price for "Annabelle" as soon as it decided to release it theatrically rather than direct-to-video. Since DeRosa-Grund failed to establish that New Line breached the Agreements and because New Line did pay him the Purchase Price for "The Conjuring," there is no basis for termination of the Agreements as a remedy.

#### b.        Breach of Implied Covenant of Good Faith and Fair Dealing

DeRosa-Grund alleges nine acts by New Line breached the implied covenant of good faith and fair dealing: 1) threatening to reduce his producer credits, 2) sending out public relations stories with false scenarios regarding the origin of the Picture, 3) refusing him access to screenings of the Picture, 4) reneging on promises to pay for his travel, 5) cutting off all communications with him, 6) refusing to employ him as a producer in connection with sequels and other films based on the Case Files, 7) failing to pay him all owed compensation, 8) falsely claiming he breached the Agreements

by registering trademarks with the USPTO and titles with the MPAA and 9) failing to provide him participation statements and payments.

None of these alleged acts were shown to breach the implied covenant, as follows:
1) New Line provided producer credit to DeRosa-Grund consistent with the PLA.
2) DeRosa-Grund offered no evidence.
3) New Line allowed DeRosa-Grund to attend one premiere consistent with the PLA.
4) New Line was not obligated to reimburse DeRosa-Grund for travel costs to the set.
5) New Line was justified in cutting off direct communications with DeRosa because of his abusive conduct, however, New Line maintained full communication with his attorney.    In addition, nothing in the Agreements requires direct negotiations between New Line and DeRosa-Grund.
6) New Line was not obligated to employ DeRosa-Grund in sequels or other films.
7) New Line was not obligated to pay additional compensation to DeRosa-Grund because of his defaults and breaches.
8) New Line had the sole right to file applications to register "The Conjuring" trademark and to register titles with the MPAA.
9) DeRosa-Grund failed to present evidence establishing that New Line failed to provide periodic statements or profit participation payments.

**c.        Fraud in the Inducement**

As discussed above in §IIIC9, this claim is barred by the Release.    Moreover, much of this claim relies on DeRosa-Grund's version of oral communications with Alexander, yet his lack of credibility renders his testimony entirely unreliable.    Finally, this claim is absolutely barred by the integration clauses in the Agreements.

**d.        Promissory Estoppel**

As discussed above in §IIIC9, this claim also is barred by the Release.    Like the fraud in the inducement claim relies on DeRosa-Grund's version of oral communications with Alexander, yet his lack of credibility renders his testimony entirely unreliable.    This claim also is barred by the integration clauses in the Agreements.

**e.        Conversion**

DeRosa-Grund claims that New Line failed to make certain payments to him.    As a matter of law, such a claim for money owed cannot be the basis of a conversion claim.    Besides, DeRosa-Grund has no ownership interest in the Defined Gross of the Picture, and therefore, has no right to receive profit participation.

**f.        Intentional Interference with Economic Relationship (re Lorraine Warren)**

As discussed above in §IIIC9, this claim is barred by the Release.    Moreover,

29

DeRosa-Grund executed the Amendment, which gave permission to New Line to enter a direct deal with Lorraine Warren to acquire her life rights.

### g.        Fraud

As discussed above in §IIIC9, this claim is barred by the Release.    This claim suffers further deficiencies.    First, it rests entirely on DeRosa-Grund's version of alleged, uncorroborated oral communications in which New Line assured him that his rights would remain the same under the Amendment.    DeRosa-Grund is simply not credible.    Second, DeRosa-Grund was represented by competent, experienced counsel in negotiating the Amendment.    Third, the New Line/Warren Life Story Agreement was attached to the Amendment for DeRosa-Grund and his counsel to review and compare to his then-current rights.

### h.        Intentional Interference with Economic Relationship (re Lionsgate)

New Line enjoys a full justification defense against this claim.    It had the right to inform Lionsgate of its Agreements with DeRosa-Grund, which it correctly alleged DeRosa-Grund had breached by failing to accord it the rights to First Negotiation and Last Refusal.

### i.        Lanham Act

This claim alleges that New Line engaged in a media campaign to purposefully hide the true origin of the Picture, namely that he had created, developed and owned the original story treatment and that New Line should have submitted his story and treatment to the Writers Guild of America for purposes of "Story by" credit.    DeRosa-Grund failed to offer any evidence in support of this claim.    More problematic, the Lanham Act applies only to the origin of tangible goods that are offered for sale, not the intellectual property embodied in such goods.

### j.        Declaratory Relief

Inasmuch as there is no merit to any of DeRosa-Grund's individual claims, there is no basis to grant any of the declaratory relief he requests, which essentially is a remedy available if were to prevail on the merits of any claim.

### IV.        CONCLUSION

This arbitration involved a powerful Hollywood studio that played by the rules and an independent producer who did not.    DeRosa-Grund knew how the system worked and cannot now complain that New Line defrauded him or breached its obligations to him.    Rather, it was DeRosa-Grund who did not abide by the crystal clear provisions of the Agreements.    Adoption of DeRosa-Grund's version of events would overturn the longstanding system that has governed Hollywood for decades and ignore the most basic rules of contract interpretation.

DeRosa-Grund's creative attorney made a valiant effort to represent a client who had

knowingly signed away all his rights.     Yet portraying DeRosa-Grund as the underdog (which the evidence did not bear out) does not make him right.

For the reasons stated above, the Arbitrator finds and declares that:

1.  New Line proved by a preponderance of the evidence that DeRosa-Grund breached the Agreements by filing trademark applications for "The Conjuring" with the USPTO, by failing to give New Line notice of its right to first negotiation and last refusal for a television deal with Lionsgate and by filing "The Conjuring" sequel titles with the MPAA.

2.  New Line did not prove by a preponderance of the evidence that DeRosa-Grund breached the Quitclaim by not producing the 8000 Case Files.

3.  New Line proved by a preponderance of the evidence that DeRosa-Grund breached the implied covenant of good faith and fair dealing by the contract breaches set forth in #1 above and by failing to give New Line timely notice of the purported destruction of the Case Files in a fire, by refusing to indemnify New Line and by disclosing confidential information.

4.  New Line is entitled to monetary damages in the amount of $107,511, plus $4117.56 in prejudgment interest, calculated at a 7% per annum rate.

5.  New Line is entitled to an award of costs in the amount of $58,147.06.

6.  Declaratory Judgment is hereby entered that:

    ▪ DeRosa-Grund has no right, title or interest to and must cease and desist from using the title "The Conjuring," including but not limited to using the title "The Conjuring" in connection with any television series.

    ▪ DeRosa-Grund has no trademark rights in the title "The Conjuring."

    ▪ REDACTED

    ▪ Any rights acquired by DeRosa-Grund with respect to the Demonologist Option are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights with respect to the Demonologist Option.

    ▪ Any rights acquired by DeRosa-Grund under any agreements with third parties related to the "Property" as that term is defined in the Agreements are the sole property of New Line under the Agreements and DeRosa-Grund is required to produce to New Line any agreement for any such rights.

    ▪ DeRosa-Grund retained no rights whatsoever in "The 'Conjuring" project other than those specifically reserved pursuant to the terms of the Agreements.

    ▪ Any rights acquired by DeRosa-Grund under the Warren Agreements are the sole property of New Line under the terms of the Agreements.

    ▪ DeRosa-Grund has no right under the Agreements to be attached as a producer to any sequel, prequel, spin off, or remake of the Picture, including but not limited to the motion pictures currently entitled "The

Conjuring 2" and "Annabelle."

- Claimants have a right to produce direct-to-video productions under the Agreements, and DeRosa-Grund is not entitled to any payment under Paragraph 5(b) of the Quitclaim Agreement for any direct-to-video productions.
- DeRosa-Grund is not entitled to any additional payment in connection with the motion picture "Annabelle" beyond the $750,000 that Claimants have already paid him.
- As a result of DeRosa-Grund's breaches of the Agreements, he is not entitled to any contingent compensation under Paragraph 5 of the Quitclaim or Paragraph 5 of the PLA, including but not limited to "contingent deferment" (i.e., box offices bonuses) and profit participation.
- Claimants have not waived their Rights of First Negotiation/Last Refusal under Paragraph 8(c) of the Amendment to the Quitclaim, all of which remain in full effect
- Claimants are entitled to accept the Lionsgate television series deal on the same monetary terms as set forth in the Lionsgate Term Sheet.
- New Line owns all right, title and interest to the approximately 8000 Case Files and other materials referenced in Paragraph 1A of the Quitclaim.

7.  DeRosa-Grund did not meet his burden of proof on any of his Counterclaims.
8.  New Line is the prevailing party in this arbitration.
9.  Judgment is hereby entered in favor of New Line and against DeRosa-Grund.

Dated:     February 5, 2015

_Jerry Friedman_

Judge Terry Friedman (Ret.)
Arbitrator